# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GEORGE W. WAGNER, JR.,**
**12718 Gladys Retreat Circle**
**Bowie, MD 20720**

       **Plaintiff,**

       **v.**

**PETE GEREN,**
**Secretary of the Army**
**101 Army Pentagon**
**Washington, DC  20310**

       **Defendant.**

*Service of the Complaint*
*and Summons also to:*

Jeffrey A. Taylor
U.S. Attorney for the District of Columbia
555 4th Street NW
5th Floor
Washington, DC  20001

Michael B. Mukasey
Attorney-General for the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC  20530

**Civil Action No. _____**

**VERIFIED COMPLAINT**

## VERIFIED COMPLAINT

George W. Wagner, Jr., through counsel, respectfully submits this Complaint against the

United States Army (Army) concerning a September 22, 2005, decision of the Army Board for

Correction of Military Records (ABCMR).  This decision granted Mr. Wagner's request for relief

in part and denied it in part.  The ABCMR's denial of the requested relief was arbitrary,

capricious, unsupported by substantial evidence, or contrary to applicable law or regulation.

Mr. Wagner claimed that the Army erroneously released him from active duty when his Active Duty for Special Work (ADSW) tour with the National Guard Bureau (NGB) expired on September 29, 1994.  The ABCMR refused to correct Mr. Wagner's records to show that at the time of his release, Mr. Wagner was on active duty due to sanctuary and was eligible for either a 20-year service retirement or medical retirement.

The ABCMR also declined to delete on a medical consult form a determination that Mr. Wagner's medical condition was simply a "phase of life problem" rather than post-traumatic stress disorder (PTSD).

Lastly, the ABCMR refused to correct a Line of Duty (LOD) investigation finding that Mr. Wagner sustained his medical condition (mental problems) in the line of duty.

This action also concerns the ABCMR's August 4, 2006, refusal to reconsider its September 22, 2005, decision concerning Mr. Wagner's case.

Mr. Wagner requests that this Court order the ABCMR to correct his military records as Mr. Wagner requested.  The ABCMR decision and reconsideration refusal are both attached.

## I.  JURISDICTION.

1.      This Court has jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 (2007).

2.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (2007).

## II.  PARTIES.

3.      George W. Wagner, Jr., is a citizen of the United States, and resides at 12718 Gladys Retreat Circle in Bowie, Maryland 20720.

4.    Defendant is the Secretary of the Army, Pete Geren, based at 101 Army Pentagon,

Washington, DC 20310.

### III.  STATEMENT OF FACTS.

5.    Mr. Wagner enlisted in the Regular Army on June 28, 1963.  He received an Honorable

Discharge from the Army on November 21, 1979, with severance pay as the result of

being physically unfit for continued service because of low back pain.

6.    On January 16, 1986, Mr. Wagner enlisted in the Army Reserve National Guard (ARNG),

with an assignment to the District of Columbia ARNG (DCARNG).  He received a

promotion to Sergeant Major, E-9, effective April 12, 1992.

### A.  Active Duty for Special Work Assignment (ADSW).

7.    On July 23, 1994, Headquarters, District of Columbia National Guard, via Orders 100-21,

ordered Mr. Wagner to active duty for special work (ADSW) from July 22, 1994, to

September 29, 1994, under then 10 U.S.C. § 672(d), (Title 10 status),[1]  to the Military

District of Washington (MDW).  This provision permitted ordering a reserve component

member to active duty or retaining him on active duty.

8.    Mr. Wagner reported to the ARNG Readiness Center in Arlington, VA.

---

[1]  10 U.S.C. § 672(d), was later changed to 10 U.S.C. § 12301(d), "Reserve components
generally," which reads, in pertinent part:

> At any time, an authority designated by the Secretary concerned may
> order a member of a reserve component under his jurisdiction to active
> duty, or retain him on active duty, with the consent of that member.

9.     However, the ADSW orders erroneously cited Title 32 U.S.C. § 502(f), as the authority

for Mr. Wagner's assignment to the MDW.[2]   As a result, the Army officials who dealt

with Mr. Wagner considered him as a paid drill status member of the DCARNG, rather

than an active duty member.

### B.  The Sanctuary Question.

10.    As of July 22, 1994, Mr. Wagner had completed 18 years, one month and 23 days of

active service.

11.    This number of years placed Mr. Wagner under the sanctuary provisions in 10 U.S.C. §

12686(a)(2008).[3]

---

[2]  32 U.S.C. § 502 (2008), "Required drills and field exercises," deals with training with the National Guard, not the active Army.  Section 502(f) states, in part:

> (a) Under regulations to be prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, each company, battery, squadron, and detachment of the National Guard, unless excused by the Secretary concerned, shall –
>
> (1) assemble for drill and instruction, including indoor target practice, at least 48 times each year; and
>
> (2) Participate in training at encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year.

[3]  10 U.S.C. § 12686(a) reads:

> (a)  Limitation.  Under regulations to be prescribed by the Secretary concerned ... a member of a reserve component who is on active duty (other than for training) and is within two years of becoming eligible for retirement pay or retainer pay under a purely military retirement system ... may not be involuntarily released from that duty before he becomes eligible for that pay, unless the release is approved by the Secretary.

12.    A June 1, 2005, ARNG Current Annual [Retirement Points] Statement showed that at the completion of his 60-day ADSW tour on September 29, 1994, Mr. Wagner had completed 18 years, 3 months and 26 days of active duty.

13.    As a result of Mr. Wagner's time in active service, the Army should have retained Mr. Wagner on active duty under the sanctuary provisions and permitted him to then retire from the active Army component.

14.    The Army, however, claims that prior to accepting the ADSW tour, Mr. Wagner had signed DA Form 1058-R, "Application for Active Duty for Training, Active Duty for Special Work, and Annual Training for Soldiers of the Army National Guard and United States Army Reserve," which requires the signer to agree to waive sanctuary and separate from active duty at the completion of the ADSW tour.

15.    This waiver is authorized under 10 U.S.C. § 12686(b) (2008).[4]

16.    Waiving sanctuary removes the service member from active duty.

17.    Mr. Wagner claims, however, that he never signed a DA Form 1058-R and never waived sanctuary.

_____

[4] This section reads:

(b).  Waiver.  With respect to a member of a reserve component who is to be ordered to active duty (other than for training) under section 12301 of this title [10 USCS § 12301] pursuant to an order to active duty that specifies a period of less than 180 days and who (but for this subsection) would be covered by subsection (a), the Secretary concerned may require, as a condition of such order to active duty, that the member waive the applicability of subsection (a) to the member for the period of active duty covered by that order.  In carrying out this subsection, the Secretary concerned may require that a waiver under the preceding sentence be executed before the period of active duty begins.

18.   Mr. Wagner does not have this DA Form 1058-R in his possession, and the Army has

never provided him with the alleged signed form.

### C.  The Internal Revenue Garnishment and Defense Finance and Accounting Service Action.

19.   In the summer of 1994, the Internal Revenue Service (IRS) garnished Mr. Wagner's

wages.

20.   As a result, the Defense Finance and Accounting Service (DFAS) deducted funds from

Mr. Wagner's pay and submitted these funds to the IRS.

21.   Mr. Wagner got the IRS levy lifted.  An August 26, 1994, Form 668-D (Release of

Levy/Release of Property from Levy) released Mr. Wagner from the levy for all wages or

other income owed or becoming owed.  The IRS faxed this release to the DFAS.

22.   Despite this release, on September 2, 1994, the DFAS collected a payment of $1,238.13

from Mr. Wagner's August 31, 1994, pay and sent that amount to the IRS.

23.   The IRS levy and the DFAS deduction from the August 1994 pay placed Mr. Wagner in

dire financial straits for the next several weeks.

24.   When Mr. Wagner contacted finance personnel about withdrawing the money and

sending it to the IRS, the DFAS refused to take any corrective action and instructed Mr.

Wagner to notify the IRS about recovering the funds.

### D.  The PTSD that Mr. Wagner Suffered as a Result of the Erroneous Garnishment.

25.   This grave financial set-back resulting from the IRS levy and the non-action of DFAS

triggered the onset of post-traumatic stress disorder (PTSD) in Mr. Wagner.

26.   On September 19, 1994, Mr. Wagner sought medical treatment and was referred to the psychiatric clinic at Walter Reed Army Medical Center.  A consultation sheet (Standard Form 513) shows that Mr. Wagner experienced two months of frustration, despair, and anxiety concerning his financial condition and housing.

27.   Mr. Wagner was followed as a psychiatric outpatient from September 19 to October 14, 1994, for grief therapy/crisis and prescribed medicine for insomnia.  He was also to undergo evaluation for continuing grief therapy/crisis adjustment disorder with multiple emotional features and secondary depression.

28.   On October 21, 1994, Mr. Wagner underwent a consultation by a psychiatrist, who noted on the Standard Form 513 the diagnosis "depression, PTSD" and advised referral for "possible psychotherapy" and prescribed Prozac and Trazadone.

### E.  The Misdiagnosis of Mr. Wagner's Mental Condition.

29.   Further medical documentation of Mr. Wagner's psychological problem, however, wrongly identified the mental condition and cause.  A December 20, 1994, DA Form 2173, Statement of Medical and Line of Duty Status, diagnosed the "disease" as a "Phase of Life Problem."  A medical opinion indicated that Mr. Wagner did not incur the PTSD in the line of duty.  The basis for this opinion was: "Financial problems prompting [Mr. Wagner] to seek care existed prior to active duty period and actually improved while on active duty."

30.   Further, Form 2173 stated that the financial problems  precipitating Mr. Wagner's emotional state began on July 1, 1994, prior to his active duty.

31.     The unit commander who signed Mr. Wagner's Form 2173 on January 4, 1995, indicated

        that a formal line of duty (LOD) investigation was unnecessary and determined that Mr.

        Wagner did not suffer his illness in the line of duty.

32.     The Director of Personnel, DCARNG, approved this LOD finding on February 2, 1995.

33.     An April 17, 1995, DVA Psychological Assessment referred to a November 1994

        evaluation of Mr. Wagner.  The physician noted, in part, in the November evaluation that

        Mr. Wagner exhibited "a significant level of distress including symptoms of anxiety,

        depression, and somatic preoccupation."  The report also claimed that Mr. Wagner

        manifested "mixed personality style comprised of Avoidant, Passive-aggressive and Self-

        defeating components.

34.     A June 10, 1995, memorandum noted that the Army had excused Mr. Wagner from

        attending required training assemblies since November 1994.  Mr. Wagner's personal

        physician had requested Mr. Wagner be excused because of his physical and mental

        condition from October through December 1994.

35.     Mr. Wagner was hospitalized in January 1995 and therefore not fit for duty.

                        **F.  First and Subsequently Revoked Transfer.**

36.     Subsequently, by orders dated July 11, 1995, the Army transferred Mr. Wagner to the

        Inactive National Guard – District of Columbia, effective May 25, 1995.

37.     However, orders dated June 6, 2003, revoked the above orders transferring Mr. Wagner to

        the inactive guard.

### G.  Veterans Administration PTSD Rating for Mr. Wagner.

38.  In an August 29, 1995, disability rating decision, the Veterans Administration (VA) granted Mr. Wagner a 50 percent rating for service-connected Post Traumatic Stress Disorder (PTSD), effective from December 30, 1994.

39.  Subsequently, on May 1, 1995, the VA increased Mr. Wagner's PTSD rating to 100 percent.

### H.  Mr. Wagner's Discharge and Notice of Eligibility for Retirement Pay.

40.  Orders of January 9, 1996, discharged Mr. Wagner from the ARNG and assigned him to the Army Reserve Control Group (Retired), effect January 1, 1996.

41.  By letter of January 21, 1996, Mr. Wagner received a notification of eligibility for retired pay at age 60 (his 20-year letter).

### I.  Line of Duty Investigation Concerning Mr. Wagner's PTSD and Reviewing Authority's Disapproval.

42.  In April 2005, the Army conducted a formal Line of Duty (LOD) investigation concerning Mr. Wagner's disability.  The investigating officer noted in the Report of Investigation (DD Form 261) that Mr. Wagner suffered from "Mental Post traumatic" and needed continuous medical care.

43.  In this Report, the investigating officer found that Mr. Wagner sustained the PTSD in the line of duty.

44.  On May 21, 2005, however, the appointing authority (Headquarters, DCARNG) and the reviewing authority, National Guard Bureau (NGB), disapproved the investigating officer's findings that the PTSD was in the line of duty.  The appointing and reviewing

authorities found there was no evidence to substantiate the findings. Specifically, the disapproval held that the evidence demonstrated that Mr. Wagner suffered from elevated anxiety because of a money problem at the time he received his orders for active duty.

**J. Findings of the ABCMR September 22, 2005, Decision.**

45.    Mr. Wagner subsequently appealed this decision to the ABCMR, which made the following findings.

46.    The Board found that the Army incorrectly issued Mr. Wagner's original ADSW orders under 32 U.S.C. § 502(f). The authority for these orders should have read 10 U.S.C. § 672(d), now 10 U.S.C. § 12301(d).

47.    The Board found that the ending date of Mr. Wagner's ADSW was September 29, 1994.

48.    The Board found that Mr. Wagner's June 1, 2005, ARNG Current Annual Statement [of retirement points] shows that Mr. Wagner had a credit of 18 years, 1 month and 23 days of active duty when he entered his ADSW tour on July 22, 1994. The DCARNG should have known that Mr. Wagner had over 18 years of active federal service at July 22, 1994.[5]

49.    The Board found that a service member applying for ADSW who was or would be within two years of qualifying for active federal service retirement would enter in the remarks section of DA Form 1058-R, the application for active duty for training, special work or annual training for Army and Army national guard soldiers in the reserve, waiving the sanctuary provisions of 10 U.S.C. § 12686(a).

_____

[5]  This amount of time in active service would place Mr. Wagner in sanctuary, under 10 U.S.C. § 12686(a).

50.    Although Mr. Wagner's DA Form 1058-R for his ADSW in 1994 was, in the ABCMR's characterization, "unavailable," the Board assert that "Administrative regularity is presumed." The ABCMR therefore presumed that Mr. Wagner waived sanctuary.

51.    The Board found that the Mr. Wagner did not meet the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders) criteria for PTSD.

52.    The Board found that because Mr. Wagner continued working on his ADSW tour during fall 1994, while continuing his medical appointments, there was no evidence that Mr. Wagner was unfit to perform his duties. Therefore, the Board found that there was no basis to refer Mr. Wagner to the Physical Disability System.

53.    The Board found that the December 20, 1994, DA Form 2173, Statement of Medical and Line of Duty Status, correctly identified Mr. Wagner's condition as a "Phase of Life Problem." The Board therefore found that the Mr. Wagner did not suffer from a mental problem, and that his condition arose from the IRS levy and the DFAS' response to the levy when he began his ADSW tour. The Board concluded that these two situations were financial and career-related, respectively, giving rise to a phase of life problem.

54.    The DA Form 2173, Item 11, incorrectly stated that Mr. Wagner's financial situation improved while he was on the ADSW tour. Actually, Mr. Wagner's financial status grew worse because the DFAS deducted $1,238.13 from Mr. Wagner's August 31, 1994, pay, after the IRS lifted the levy. Therefore, the ABCMR should have amended DA Form 2173 to delete the phrase "and actually improved while on active duty."

55.    The remainder of the phrase in DA Form 2173, Item 11, "Financial problems prompting [Mr. Wagner] to seek care existed prior to active duty period ..." and Item 15, "Emotional

concerns were precipitated by financial problems which started the first of July 1994,

prior to start of active duty service," appear to be accurate.  If the IRS had not placed a

levy on Mr. Wagner prior to his entering his ADSW tour, DFAS would not have

exacerbated the problem.

### K.  The ABCMR Determination and Recommendation.

56.    The ABCMR granted partial relief by recommending:

> a.  Changing the authority for Mr. Wagner's July 23, 1994, orders
> to his ADSW tour to 10 U.S. C. 672(d) [now 10 U.S.C.
> §12301(d)].

> b.  Correcting Item 11 of the December 20, 1994, DA Form 2173
> to delete the phrase "... and actually improved while on active
> duty."

57.    The ABCMR denied the rest of the requested relief, refusing to correct Mr. Wagner's

records to show:

> a.  The Army retained Mr. Wagner on active duty due to sanctuary
> and gave him a 20-year service retirement;

> b.  The Army retained Mr. Wagner on active duty due to sanctuary
> and gave him a medical retirement on an appropriate date
> determined by the ABCMR;

> c.   Deletion of the determination "phase of life problem" on the
> December 20, 1994, DA Form 2173;

> d.  Correction of Mr. Wagner's LOD determinations to attribute
> Mr. Wagner's condition to the severe stress of the financial
> situation that the DFAS created by deducting money from his pay
> and submitting the money to the IRS; and

> e.  Granting Mr. Wagner with compensation for all the requested
> corrections.

### L.  The ABCMR's Refusal of a Request for Reconsideration.

58.    Mr. Wagner subsequently sent a request for reconsideration of the ABCMR decision to

Senator Barbara A. Mikulski.

59.    In an August 4, 2006, letter to Mr. Wagner, the ABCMR refused to reconsider the

decision and any further such requests.  This letter informed Mr. Wagner that he could

seek relief in court.

### IV.  CAUSE OF ACTION.

60.    Mr. Wagner incorporates and reasserts Paragraphs 1 to 59 of this Complaint.

61.    The Army, through the ABCMR, denied Mr. Wagner relief by denying correction of his

military records as Mr. Wagner requested.  The ABCMR decision was arbitrary,

capricious, unsupported by substantial evidence, or contrary to applicable law or

regulation.

### V.  RELIEF REQUESTED.

WHEREFORE, Mr. Wagner requests the following relief:

1.  A determination by this Court that the ABCMR's denial of full relief was arbitrary and

capricious and unsupported by substantial evidence or contrary to applicable law or regulation;

and

2.  A remand to the ABCMR so that the Board can:

a  Correct his military records to show:

i.  Mr. Wagner was on active duty due to sanctuary during and at the end

of his ADSW tour;

ii.  Mr. Wagner never waived sanctuary;

-13-

                  iii.  Deletion of the determination "phase of life problem" on the

December 20, 1994, DA Form 2173;

                  iv.  Correction of Mr. Wagner's LOD determinations to attribute Mr.

Wagner's condition to the severe stress of the financial situation that the DFAS created by

deducting money from his pay and submitting the money to the IRS; and

              b.  Order the Army to grant Mr. Wagner a 20-year service retirement or, in the

alternative, to grant him a medical retirement on an appropriate date;

     3.  Attorney fees and costs pursuant to the Equal Access to Justice Act (EAJA); 28 U.S.C.

§ 2412 (2007); and

     4.  Any further relief that this Court deems just and proper.

                      Respectfully submitted,

January 30, 2008

                      _____
                      James R. Klimaski, #243543
                      Lynn I. Miller, #941559
                      Klimaski & Associates, P.C.
                      1625 Massachusetts Avenue NW
                      Suite 500
                      Washington, DC 20036-2245
                      202-296-5600
                      202-296-5601 Fax
                      Klimaski@Klimaskilaw.com
                      Miller@Klimaskilaw.com

                      ***Attorneys for George W. Wagner, Jr.***

**VERIFICATION**

I, George W. Wagner, Jr., have read the above complaint and verify under penalty of perjury that the facts alleged are true to the best of my knowledge and belief.

Executed this 29th day of January 2008.

George W. Wagner, Jr.

# *Attachment   1*

# *Army BCMR Decision*
# *25 September 2005*

## *Cover Memo dated 3 October 2005*



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
MANPOWER AND RESERVE AFFAIRS
1901 SOUTH BELL STREET, 2ND FLOOR
ARLINGTON, VA 22202-4508

SFMR-RB                                                    October 3, 2005

MEMORANDUM FOR US ARMY REVIEW BOARDS AGENCY SUPPORT DIVISION, ST. LOUIS (SFMR-RBR-SL), 9700 PAGE AVENUE, ST. LOUIS, MO 63132-5200

SUBJECT: Army Board for Correction of Military Records Record of Proceedings for Wagner, George W. Jr., SSN 442441124, AR20050012332

1. Under the authority of Title 10, United States Code, section 1552, the recommendation of the Army Board for Correction of Military Records is hereby approved, and I direct that all of the Department of the Army records of the individual concerned be corrected as shown under Recommendation in the Proceedings of the Board in the subject case enclosed.

2. Request necessary administrative action be taken to effect the correction of records as indicated no later than **February 3, 2006**. Further, request that the individual concerned and counsel, if any, as well as any Members of Congress who have shown interest be advised of the correction and that the Army Board for Correction of Military Records be furnished a copy of the correspondence.

BY ORDER OF THE SECRETARY OF THE ARMY:

Encl

Karl F. Schneider
Deputy Assistant Secretary
(Army Review Boards)

CF:
( )Applicant
( )Counsel
( )DFAS
( )NGB

Printed on Recycled Paper



**DEPARTMENT OF THE ARMY**
BOARD FOR CORRECTION OF MILITARY RECORDS
1901 SOUTH BELL STREET 2ND FLOOR
ARLINGTON, VA 22202-4508

RECORD OF PROCEEDINGS

IN THE CASE OF:    WAGNER, GEORGE W. JR.

BOARD DATE:        22 September 2005
DOCKET NUMBER:  AR20050012332

I certify that hereinafter is recorded the true and complete record of the proceedings of the Army Board for Correction of Military Records in the case of the above-named individual.

| | |
|---|---|
| Mr. Carl W. S. Chun | Director |
| Mrs. Nancy L. Amos | Analyst |

The following members, a quorum, were present:

| | |
|---|---|
| Mr. James E. Anderholm | Chairperson |
| Mr. Bernard P. Ingold | Member |
| Mr. Michael J. Flynn | Member |

The Board considered the following evidence:

Exhibit A - Application for correction of military records.

Exhibit B - Military Personnel Records (including advisory opinion, if any).

ABCMR Record of Proceedings (cont)                    AR20050012332

THE APPLICANT'S REQUEST, STATEMENT, AND EVIDENCE:

1.  The applicant requests, in effect:

    a.  his records be corrected to show he was retained on active duty due to sanctuary and given a 20-year length of service retirement;

    b.  in the alternative, his records be corrected to show he was retained on active duty due to sanctuary and given a medical retirement on an appropriate date determined by the Army Board for Correction of Military Records (ABCMR);

    c.  his DA Form 2173 (Statement of Medical and Line of Duty Status) initiated on 20 December 1994 be corrected to delete the determination "phase of life problem" and a mention that his "...financial situation improved..." while he was on that period of duty";

    d.  his line of duty (LOD) determinations be changed to attribute his condition to the severe stress of a financial situation in which the Defense Finance and Accounting Service (DFAS) deducted funds from his pay and submitted them to the Internal Revenue Service (IRS);

    e.  the basis of authority of his active duty for special work (ADSW) orders be changed from Title 32, U. S. Code to Title 10, U. S. Code;

    f.  compensation due from all requested corrections; and

    g.  a waiver of the requirement to exhaust administrative remedies regarding appealing the results of the formal LOD.

2.  The applicant states he was erroneously released from active duty at the expiration of his ADSW tour with the National Guard Bureau (NGB) on 29 September 1994 because he had more than 18 years of active service.

3.  The applicant states during his last period of active duty he suffered a severe financial setback that he feels was the main cause of the onset of his post-traumatic stress disorder (PTSD) that was later diagnosed by the Department of Veterans Affairs (DVA). Everyone, except Major P___, the 2005 investigating officer, and Mr. M___ in the 2005 advisory opinion, stated the root of his problems has always been the garnishment of wages by the IRS. In truth, the IRS was very understanding of his situation and cooperative and removed the garnishment action. His distress was caused by the way finance personnel handled his requests with an attitude of "We did our job and this is your problem so go see the IRS."

2

ABCMR Record of Proceedings (cont)                    AR20050012332

4. The DA Form 2173 was initiated in and completed by the office to which he was assigned when it should have been completed by the unit to which he was attached for administration, Headquarters Company, U. S. Army at Fort Myer, VA. The 1994 and subsequent determinations of his mental state erroneously assumed he entered that tour destitute and his active duty pay for the period vastly improved his lot. He knew of the levy against him and soon got the levy removed. The IRS faxed the release to DFAS in late August 1994, but for some reason DFAS continued to deduct funds from his pay. That put him in severe financial straits for the next several weeks.

5. The applicant states his original ADSW orders incorrectly cited Title 32, U. S Code, section 502(f) as the authority in support of the Military District of Washington (MDW) when it should have cited Title 10, U. S. Code, section 672(d) (later changed to section 12301(d)) in support of the NGB.

6. The applicant provides the NGB's 29 July 2005 advisory opinion; a corrected copy of his Retirement Points Accounting Management System retirement points statement; the 2005 LOD with related documents; and a partially cutoff web-page extract regarding the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV) V-codes related to phase of life problems, symptoms, and treatments.

CONSIDERATION OF EVIDENCE:

1. The applicant was born on 26 September 1945. He enlisted in the Regular Army on 28 June 1963. He was honorably discharged from the Regular Army on 21 November 1979 with severance pay as the result of being physically unfit for continued service (low back pain).

2. On 16 January 1986, the applicant enlisted in the ARNG with assignment to the District of Columbia ARNG (DCARNG). He was promoted to Sergeant Major, E-9 effective 12 April 1992.

3. Headquarters, District of Columbia National Guard Orders 100-21, dated 23 July 1994, ordered the applicant to ADSW for the period 22 July 1994 to 29 September 1994 in a Title 10 status for the purpose of providing support to MDW and to report to the ARNG Readiness Center in Arlington, VA. Title 32, U. S. Code, section 502(f) was cited as the authority for that action.

4. A Form 668-D (Release of Levy/Release of Property from Levy) dated 26 August 1994 showed the IRS released the applicant from a previously-imposed levy of all wages, salary and other income then owed or becoming owed to him.

3

ABCMR Record of Proceedings (cont)                    AR20050012332

5. A memorandum dated 2 September 1994 showed DFAS collected a payment of $1,238.13 from the applicant's end-of-month August 1994 pay and sent it to the IRS. Immediate relief in the form of Army Emergency Relief financial assistance was requested. The result of this request is not available.

6. A Standard Form 513 (Consultation Sheet) dated 19 October 1994 shows a Medical Corps Captain requested a consultation for the applicant to be conducted by the DVA. The reason for the request for consultation stated that, essentially, the applicant had 2 months of frustration, despair, and anxiety regarding financial concerns/housing. The Consultation Sheet indicated he was followed in Outpatient Psychiatry from 19 September to 14 October for grief therapy/crisis and he was prescribed medication for insomnia. It requested reevaluation for continuing grief therapy/crisis adjustment disorder with multiple emotional features and secondary depression.

7. The Standard Form 513 showed the consultation was performed on 21 October 1994 at a DVA medical facility. At the end of the consultation, the examining psychiatrist wrote the words, "depression, PTSD, refer to Dr. (name omitted) for possible psychotherapy" and prescribed Prozac and Trazadone.

8. Item 10 (Nature and Extent of Injury, Disease) of a DA Form 2173 initiated on 20 December 1994 indicated the applicant was evaluated for a "disease" identified as a "Phase of Life Problem." Item 11d indicated a medical opinion the applicant's injury was not incurred in the line of duty and the basis for that opinion was listed as, "Financial problems prompting him (the applicant) to seek care existed prior to active duty period and actually improved while on active duty." Item 15 (Details of the Accident or History of the Disease) contained the entry, "Emotional concerns were precipitated by financial problems which started the first day of July 1994, prior to start of active duty service." Item 15 (Details of Accident or History of Disease (how, where, when)) indicated, "Emotional concerns were precipitated by financial problems which started the first of July 1994, prior to start of active duty service."

9. A Colonel identified as the unit commander or unit advisor signed the DA Form 2173 on 4 January 1995 and indicated a formal line of duty investigation was not required and the injury was not considered to have been incurred in the line of duty. The LOD findings were approved on 2 February 1995 by the Director of Personnel, DCARNG.

10. A DVA Psychological Assessment with a date of report of 17 April 1995, conducted by Doctor VM, made reference to an evaluation conducted in November 1994. Doctor VM noted in this evaluation, in part:

4

ABCMR Record of Proceedings (cont)                    AR20050012332

"The results of the present assessment reveal an acknowledgement of a significant level of distress including symptoms of anxiety, depression, and somatic preoccupation. He manifests a mixed personality style comprised of Avoidant, Passive-aggressive and Self-defeating components. He also acknowledges Schizoid and Dependent tendencies. Furthermore, this patient endorsed symptom clusters that characterize Schizotypal and Borderline pathologies as well as major Depression and an unspecified thought disorder."

11. A memorandum dated 10 June 1995 indicated the applicant had been excused from attending required training assemblies since November 1994. His personal physician requested he be excused due to [his] physical and mental condition during October through December 1994. Subsequently, he was hospitalized in January 1995 and was currently still hospitalized and not fit for duty. Therefore, he would be transferred to the Inactive National Guard. On orders dated 11 July 1995, the applicant was transferred to the Inactive National Guard – District of Columbia effective 25 May 1995. (Those orders were revoked on orders dated 6 June 2003.)

12. In a 29 August 1995 DVA rating decision, the applicant was granted service connection for PTSD at the 50 percent rate effective from 30 December 1994. Combined with a prior 20 percent evaluation for recurrent low back pain with muscle spasms effective from 24 September 1981, he was granted a combined rating of 60 percent effective from 30 December 1994. A 20 October 1995 DVA rating decision increased his PTSD rating to 100 percent effective from 1 May 1995. The rating decision noted the applicant had been admitted on 5 May 1995 for alcohol dependence and PTSD. He indicated he had been homeless and jobless since 29 September 1994. He indicated he used alcohol to fall asleep due to nightmares of Vietnam. He had intrusive thoughts and flashbacks and persistent nightmares. He had guilty feelings about war.

13. On orders dated 9 January 1996, the applicant was discharged from the ARNG and assigned to the U. S. Army Reserve Control Group (Retired) effective 1 January 1996.

14. The applicant's notification of eligibility for retired pay at age 60 (his 20-year letter) is dated 21 January 1996.

15. Headquarters, District of Columbia National Guard Permanent Orders 21-21 dated 12 August 1996 awarded the applicant the United States Meritorious Service Medal for exceptional meritorious service while serving in positions of great responsibility during the period 28 June 1963 to 24 May 1995.

ABCMR Record of Proceedings (cont)                    AR20050012332

16. An ARNG Current Annual [Retirement Points] Statement dated 1 June 2005 shows the applicant had completed 18 years, 3 months, and 26 days of active duty as of 29 September 1994.

17. A formal LOD was conducted in April 2005. The investigating officer noted in item 10a(4) (How sustained) of the DD Form 261 (Report of Investigation Line of Duty and Misconduct Status), "Mental Stress, Financial, Death of Spouse," noted in item 10b (Medical Diagnosis), "Mental Post traumatic," and noted in item 10g (Remarks) that the applicant needed to seek continuous medical care for his illness. The investigating officer found the illness to have been incurred in the line of duty.

18. On 21 May 2005, the appointing authority (Headquarters, DCARNG) and the reviewing authority (NGB) disapproved the findings of the investigating officer. Both found there was no evidence to substantiate the LOD findings made by the investigating officer. Item 21 (Approving authority – reasons and substituted findings) contained the entry, "APPROVED NOT IN LINE OF DUTY – NOT DUE TO OWN MISCONDUCT for post traumatic stress disorder." There was also a note that, after extensive review by the staff of the Office of The Surgeon and Judge Advocate, NGB, nothing was found to support PTSD upon entrance to active duty in July 1994. All evidence pointed to an elevated anxiety due to a personal monetary problem about the time ordered to active duty.

19. The applicant will become eligible for a nonregular retirement when he turns age 60 on 26 September 2005.

20. An advisory opinion on this case was prepared by the NGB. The advisory opinion noted, in part:

    (1) The ARNG Current Annual Statement [of retirement points] dated 1 June 2005 shows the applicant was credited with 18 years, 1 month, and 23 days of active duty when he entered his ADSW tour on 22 July 1994. Therefore, when he entered the ADSW tour he either was, or should have been considered to be, covered by the sanctuary provisions of Title 10, U. S. Code, section 12686(a) and should not have been released from active duty on 29 September 1994 as stated in the self-terminating orders unless he waived sanctuary.

    (2) Headquarters, District of Columbia National Guard Orders 100-21 dated 23 July 1994 ordering the applicant to ADSW at the NGB was improper in its purpose and the authority cited, and the ending date was questionable. The applicant was ordered to report to the ARNG Readiness Center on 22 July 2004. The purpose clearly established that tour should have been ordered under Title

6

ABCMR Record of Proceedings (cont)                    AR20050012332

10, U. S Code although it erroneously stated it was "in support of MDW." The
ARNG Readiness Center is a Field Operating Activity of the NGB, and thus,
Headquarters, Department of the Army. The authority should have read "Title 10
USC 672(d)." The advisory opinion noted that this citation was later re-codified in
Title 10, U. S. Code as section 12301(d).

        (3) The LOD on the DA Form 2173 initiated on or about 20 December
1994 and signed on 4 January 1995 does not appear adequate to the standards
and requirements for LODs on Soldiers on ADSW at the NGB. The applicant's
first apparent onset of PTSD was at his medical appointment on 19 September
1994, almost two months after starting his ADSW tour. The applicant was
subject to an IRS levy, which the IRS released on 26 August 1994. However,
DFAS had already deducted $1,238.13 from his 31 August 1994 pay for the IRS
and told the applicant he would have to apply to the IRS to have those and other
funds returned to him. His financial situation was far from improved during his
period of ADSW as stated in the LOD. The LOD investigations all seem to report
the applicant suffered from PTSD before he entered the ADSW tour, but the first
report of contact with health care providers for the condition appears to be
19 September 1994. Since the incident occurred while the applicant was in a
Title 10 status, the LOD should have been conducted by the NGB or
Headquarters Company, U. S. Army [Fort Myer, VA] regardless of the fact he
was not in active Federal service when the investigation was started in
December 1994.

        (4) Headquarters, District of Columbia National Guard Orders 097-503
dated 11 July 1995 transferring the applicant to the Inactive National Guard
apparently were issued without a proper basis of authority because, when
challenged, they were subsequently revoked in Headquarters, District of
Columbia National Guard orders 157-007 dated 6 June 2003.

21. The advisory opinion noted the applicant continued to work into early
October [1994] and continued his medical appointments expecting that his
ADSW tour orders [extension] would be forthcoming.

22. The advisory opinion recommended the applicant's ADSW tour termination
be nullified; the DA Form 2173 completed in January 1995 be nullified; the
findings of the formal LOD investigation performed by Major P___ in April 2005
that the applicant's condition manifested itself while on duty and that it be
determined to be in line of duty be approved; and the applicant be awarded a
medical retirement as of a reasonable date such disqualification would have
been made had he been processed for such a retirement.

7

ABCMR Record of Proceedings (cont)                        AR20050012332

23. Based upon the advisory opinion, the applicant submitted his application to
the ABCMR. Twice previously the applicant had requested a medical retirement.
His requests were denied by the ABCMR in Docket Number AR1999023985 on
15 February 2000 and in Docket Number AR20040000035 on 31 August 2004.
The staff of the ABCMR also administratively closed a third request for a medical
retirement by letter dated on 27 January 2005. In that letter, the applicant was
informed, in part, that an LOD finding has no bearing on whether referral to the
Physical Disability System is required.

24. Title 10, U. S. Code, section 12686(a) states a member of a Reserve
Component who is on active duty (other than for training) and is within two years
of becoming eligible for retired pay under a purely military retirement system may
not be involuntarily released from that duty before he becomes eligible for that
pay unless the release is approved by the Secretary.

25. On 5 October 1994, Title 10, U. S. Code, section 12686(b) was added to
provide, with respect to a member of a Reserve Component who is to be ordered
to active duty (other than for training) under section 12301 of this title pursuant to
an order to active duty that specifies a period of less than 180 days and who (but
for this subsection) would be covered by subsection (a), the Secretary concerned
may require, as a condition of such order to active duty, that the member waive
the applicability of subsection (a) to the member for the period of active duty
covered by that order. In carrying out this subsection, the Secretary concerned
may require that a waiver under the preceding sentence be executed before the
period of active duty begins.

26. Army Regulation 135-200 (Active Duty for Training, Annual Training, and
Active Duty for Special Work of Individual Soldiers), the version in effect at the
time, prescribed policies and procedures for ordering ARNG and U. S. Army
Reserve Soldiers to annual training (AT), active duty for training (ADT) , initial
active duty for training (IADT), and ADSW. Paragraph 1-11 stated ADT, IADT,
and ADSW orders would clearly cite section 672(d), Title 10, U. S. Code as the
authority for ordering a Soldier to active duty. (The current version of the
regulation states section 12301(d) will be cited.) Paragraph 1-11a(10)(a) stated
the "sanctuary" provision would not apply to Soldiers who came within 2 years of
retirement eligibility during a period of AT, ADT, or IADT.

27. Army Regulation 135-200, paragraph 6-6a(6) stated, if being considered for
an ADSW tour in the first 2 months of a fiscal year, the Soldier must have had a
minimum break of 60 continuous calendar days following the last day of an
ADSW tour in the previous fiscal year. That break was only required if the
Soldier had accumulated over 30 days of ADSW in the last quarter of the
previous fiscal year.

8

ABCMR Record of Proceedings (cont)                    AR20050012332

28. Army Regulation 135-200, paragraph c stated a Soldier applying for ADSW who was or would be within 2 years of qualifying for an active Federal service retirement would enter the following in the remarks section of the DA Form 1058-R (Application for Active Duty for Training, Active Duty for Special Work, and Annual Training for Soldiers of the Army National Guard and U. S. Army Reserve):

    "I understand that, although at the completion of my tour I may be within 2 years of qualifying for an active duty retirement under 10 USC 1293, 3911, or 3914, it is current Army policy that I will be released from active duty at the completion of my tour unless my continued retention on active duty is considered in the best interests of the Army by the Assistant Secretary of the Army (Manpower and Reserve Affairs). I hereby consent to being ordered to active duty for the period indicated and consent to my release from active duty at the completion of this tour."

29. The current version of the DA Form 1058-R is dated July 1993. The required statement is pre-printed in item 24 (Remarks).

30. Army Regulation 635-40 governs the evaluation of physical fitness of Soldiers who may be unfit to perform their military duties because of physical disability. The unfitness is of such a degree that a Soldier is unable to perform the duties of his office, grade, rank or rating in such a way as to reasonably fulfill the purposes of his employment on active duty. In pertinent part, it states that according to accepted medical principles, certain abnormalities and residual conditions exist that, when discovered, lead to the conclusion that they must have existed or have started before the individual entered the military service. Examples are manifestation of lesions or symptoms of chronic disease from date of entry on active military service (or so close to that date of entry that the disease could not have started in so short a period) will be accepted as proof that the disease existed prior to entrance into active military service.

31. Army Regulation 635-40, paragraph 3-4 states, under the laws governing the Army Physical Disability Evaluation System, Soldiers who sustain or aggravate physically unfitting disabilities must meet certain line of duty criteria to be eligible to receive retirement and severance pay benefits including that the disability have been incurred or aggravated while the Soldier was entitled to basic pay or as the proximate cause of performing active duty or inactive duty.

32. The DSM-IV describes "Phase of Life Problem" as a category that can be used when the focus of clinical attention is a problem associated with a particular developmental phase or some other life circumstance that is not due to a mental disorder or, if it is due to a mental disorder, is sufficiently severe to warrant

9

ABCMR Record of Proceedings (cont)                    AR20050012332

independent clinical attention. Examples include problems associated with entering school, leaving parental control, starting a new career, and changes involved in marriage, divorce, and retirement.

33. The DSM-IV categorizes PTSD as an anxiety disorder. It states the essential feature of PTSD is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity, or witnessing an event that involves death, injury, or a threat to the physical integrity of another person, or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate. The person's response to the event must involve intense fear, helplessness, or horror. Traumatic events that are experienced directly include, but are not limited to, military combat, violent personal assault, being kidnapped, being taken hostage, terrorist attack, torture, incarceration as a prisoner or war or in a concentration camp, natural or manmade disaster, severe automobile accidents, or being diagnosed with a life-threatening illness.

34. The DSM-IV states the essential feature of Acute Stress Disorder is the development of characteristic anxiety, dissociative, and other symptoms that occurs within 1 month after exposure to an extreme traumatic stressor. Because PTSD requires more than 1 month of symptoms, this diagnosis cannot be made during this initial 1-month period. Symptoms of Acute Stress disorder are experienced during or immediately after the trauma, last for at least 2 days, and either resolve within 4 weeks after the conclusion of the traumatic event or the diagnosis is changed.

35. The DSM-IV states the essential feature of Generalized Anxiety Disorder is excessive anxiety and worry, occurring more days than not for a period of at least 6 months. The anxiety and worry are accompanied by at least three additional symptoms from a list that includes restlessness, being easily fatigued, difficulty concentrating, irritability, muscle tension, and disturbed sleep. The intensity, duration, or frequency of the anxiety and worry are far out of proportion to the actual likelihood or impact of the feared event.

36. Army Regulation 600-8-1 (Army Casualty and Memorial Affairs and Line of Duty Investigations), in effect at the time, Part 5, set forth policies and procedures for investigating the circumstances of the disease, injury, or death of a service member. Paragraph 38-4b stated the Chief, NGB acted in the name of the Secretary of the Army as final approving authority for the ARNG except for those members in a federalized status. Paragraph 38-8a stated the LOD

10

ABCMR Record of Proceedings (cont)                    AR20050012332

appointing authority normally was the commander who exercised special court-martial convening authority over the Soldier involved.

DISCUSSION AND CONCLUSIONS:

1.  It appears the applicant's original ADSW orders incorrectly cited Title 32, U. S Code, section 502(f) as the authority.  As the advisory opinion noted, the applicant was ordered to report to the ARNG Readiness Center, a Field Operating Activity of the NGB.  In accordance with the advisory opinion and Army Regulation 135-200, the authority should have read "Title 10 USC 672(d)."

2.  Contrary to the advisory opinion stating the ending date of the applicant's period of ADSW was questionable, the ending period of 29 September 1994 appears to have been in conformance with Army Regulation 135-200 (i.e., if being considered for an ADSW tour in the first 2 months of a fiscal year, the Soldier must have had a minimum break of 60 continuous calendar days following the last day of an ADSW tour in the previous fiscal year.  The break was only required if the Soldier had accumulated over 30 days of ADSW in the last quarter of the previous fiscal year.)

3.  The applicant had performed more than 30 days of ADSW in the last quarter of fiscal year 1994 (22 July through 29 September 1994).  By regulation, he could not have started another ADSW tour until about 29 November 1994.

4.  The applicant contended he was erroneously released from active duty at the expiration of his ADSW tour on 29 September 1994 because he had more than 18 years of active service (i.e., active duty).

5.  It is acknowledged the ARNG Current Annual Statement [of retirement points] dated 1 June 2005 shows the applicant was credited with 18 years, 1 month, and 23 days of active duty when he entered his ADSW tour on 22 July 1994.  As the advisory opinion pointed out, the DCARNG should have known the applicant had over 18 years of active Federal service at that time.  The advisory opinion's citing of the sanctuary provisions of Title 10, U. S. Code, section 12686(a) is also noted.

6.  However, Title 10, U. S. Code, section 12686(a) states a member of a Reserve Component who is on active duty (other than for training) and is within two years of becoming eligible for retired pay ...may not be <u>involuntarily</u> released from that duty before he becomes eligible for that pay.  It appears section 12686(b) was added on 5 October 1994 to codify the provisions already followed by the Army (and presumably the other Services) and already outlined in Army Regulation 135-200.  That is, a Soldier applying for ADSW who was or would be

11

ABCMR Record of Proceedings (cont)                    AR20050012332

within 2 years of qualifying for active Federal service retirement would enter in the remarks section of the DA Form 1058-R a request for a waiver of this rule, provide his or her consent to being ordered to active duty for the period indicated, and consent to his or her release from active duty at the completion of the tour.

7. The applicant's DA Form 1058-R for the ADSW period in question is not available. However, the current version of the form is dated July 1993 and so was also the form the applicant would have completed. The required statement is pre-printed in item 24; therefore, the statement could not have been left off the form inadvertently. Administrative regularity is presumed. Therefore, appears the applicant was not involuntarily released from active duty and so the sanctuary provisions of Title 10, U. S. Code, section 12686(a) did not apply to him.

8. The applicant contends he suffered a severe financial setback during his last period of active duty that he feels was the main cause of the onset of his PTSD. The diagnosis of the DVA physician will not be disputed; however, it is noted it appears he did not meet the DSM-IV criteria for a diagnosis of PTSD while he was on active duty. The DSM-IV requires an extreme traumatic stressor, such as military combat, to trigger a response that involves intense fear, helplessness, or horror. It also requires more than one month of symptoms. He was first seen by military medical personnel on 19 September 1994 for grief therapy/crisis. It does not appear he made any mention of "... intrusive thoughts and flashbacks and persistent nightmares" and guilty feelings about war" that would have been symptomatic of PTSD until October or November 1994, after he was released from active duty.

9. More importantly, however, in order to be determined to be unfit the unfitness must be of such a degree that the Soldier is unable to perform his duties in such a way as to reasonably fulfill the purposes of his employment on active duty. There is no evidence to show the applicant was ever unfit to perform his duties while on active duty. The advisory opinion even noted the applicant continued to work into early October [1994] and continued his medical appointments expecting that his ADSW tour orders [extension] would be forthcoming. That is, he felt sufficiently fit, even though he was being treated for a medical condition, after he was properly released from active duty. Therefore, the evidence shows there was no basis for referring him to the Physical Disability System.

10. The applicant contended the DA Form 2173 was initiated in and completed by the office to which he was assigned when it should have been completed by the unit to which he was attached for administration, Headquarters Company, U. S. Army at Fort Myer, VA. In accordance with the advisory opinion and the regulation in effect at the time, it appears the applicant is correct.

12

ABCMR Record of Proceedings (cont)                    AR20050012332

11.  However, it has already been concluded there was no basis for referring the applicant to the Physical Disability System.  In the ABCMR's 27 January 2005 letter to the applicant he was informed, in part, that an LOD finding has no bearing on whether referral to the Physical Disability System is required.  The DVA has already awarded the applicant a 100 percent service-connected disability rating.  Any recommendation the Board would make concerning correcting the LOD to show a finding of In Line of Duty would provide the applicant no effective relief.  However, this is not meant to prevent the applicant from appealing the findings of the LOD based upon it being conducted by a command not authorized to do so.

12.  The applicant contended the DA Form 2173 initiated on 20 December 1994 improperly determined he had a "phase of life problem." The DSM-IV describes "Phase of Life Problem" as a category that can be used when the focus of clinical attention is a problem associated with a particular developmental phase or some other life circumstance that is not due to a mental disorder.  Examples include problems associated with starting a new career and changes involved in marriage, divorce, and retirement.  The applicant's problem at the time was not due to a mental disorder.  As he acknowledges, it was due to a financial problem with the IRS and then to DFAS's response to the IRS levy (and failure to respond to the release from levy) when he began his ADSW tour (analogous to a new career).  Therefore, it appears the determination he had a "phase of life problem" was correct.

13.  The applicant contended the DA Form 2173 initiated on 20 December 1994 improperly mentioned his "...financial situation improved..." while he was on that period of duty."  Based upon the fact DFAS deducted $1,238.13 from his 31 August 1994 pay for the IRS after he had been released from the IRS levy, there is sufficient evidence to show his financial situation was not improved during that period of duty.  Therefore, the DA Form 2173 should be amended to delete the phrase "...and actually improved while on active duty" in item 11.

14.  The remainder of the phrase in item 11 of the DA Form 2173 initiated on 20 December 1994, "Financial problems prompting him to seek care existed prior to active duty period..." appears to be accurate.  Had the IRS not placed a levy against him prior to his entry on the ADSW tour in the first place, DFAS could not have exacerbated the problem.  The entry in item 15, "Emotional concerns were precipitated by financial problems which started the first of July 1994, prior to start of active duty service," appears to be accurate for the same reason.

13

ABCMR Record of Proceedings (cont)                          AR20050012332

BOARD VOTE:

| | | |
|---|---|---|
| _____ | _____ | _____ | GRANT FULL RELIEF |
| X | Kai | m√~ | GRANT PARTIAL RELIEF |
| _____ | _____ | _____ | GRANT FORMAL HEARING |
| _____ | _____ | _____ | DENY APPLICATION |

BOARD DETERMINATION/RECOMMENDATION:

1.  The Board determined that the evidence presented was sufficient to warrant a recommendation for partial relief.  As a result, the Board recommends that all Department of the Army records of the individual concerned be corrected by:

   a.  changing the authority cited in Headquarters, District of Columbia National Guard Orders 100-21 dated 23 July 1994 to read "Title 10 USC 672(d)"; and

   b.  correct item 11 of the DA Form 2173 initiated on 20 December 1994 to delete the phrase "...and actually improved while on active duty.".

2.  The Board further determined that the evidence presented is insufficient to warrant a portion of the requested relief.  As a result, the Board recommends denial of so much of the application as pertains to correcting his records to show he was retained on active duty due to sanctuary and given a 20-year length of service retirement; correcting his records to show he was retained on active duty due to sanctuary and given a medical retirement on an appropriate date determined by the Army Board for Correction of Military Records (ABCMR); correcting his DA Form 2173 initiated on 20 December 1994 to delete the determination "phase of life problem"; correcting his LOD determinations to attribute his condition to the severe stress of a financial situation in which DFAS deducted funds from his pay and submitted them to the IRS; and granting him compensation due from all requested corrections.


                                   _Jame E Archuleta_
                                        CHAIRPERSON


                                        14

# Attachment  2


# Army BCMR Refusal to Reconsider


# 4 August 2006



**DEPARTMENT OF THE ARMY**
BOARD FOR CORRECTION OF MILITARY RECORDS
1901 SOUTH BELL STREET 2ND FLOOR
ARLINGTON, VA 22202-4508

August 4, 2006

Case Management Division/gws
AR20060005058

SGM (RET) GEORGE W. WAGNER
1408 HAMPSHIRE W. COURT #14
SILVER SPRING, MD 20903

Dear SGM Wagner:

This is in response to your December 27, 2005 letter to Senator Barbara A. Mikulski requesting reconsideration of previous Army Board for Correction of Military Records (ABCMR) decisions. The following cases (AR1999023985; AR20040000035 and AR20050012332) were considered by the ABCMR on February 15, 2000; August 31, 2004 and September 22, 2005 respectively.

Army Regulation 15-185 sets forth procedures for processing requests for correction of military records. Paragraph 2-15b governs requests for reconsideration. This provision of the regulation allows an applicant to request reconsideration of an earlier ABCMR decision if the request is received within one year of the ABCMR's original decision and it has not previously been reconsidered.

The staff of the ABCMR reviewed your request for reconsideration and determined that your request for reconsideration has been previously considered on two occasions. As a result, your request for reconsideration does not meet the criteria outlined above, and we are returning your request without further action.

The ABCMR will not consider any further requests for reconsideration of this matter. However, you have the option to seek relief in a court of appropriate jurisdiction.

Sincerely,

Walter Avery
Chief, Case Management Division

Enclosure



JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

George W. Wagner, Jr. (Bowie, MD)

88888

## DEFENDANTS

Pete Geren, Secretary of the Army, Army Pentagon, Washington, DC

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Prince George's
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

James R. Klimaski, Lynn I. Miller
1625 Massachusetts Ave. NW -- Suite 500
Washington, DC  20036-2245
202-296-5600

Case: 1:08-cv-00213
Assigned To : Urbina, Ricardo M.
Assign. Date : 2/6/2008
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

O 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

O 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**◉ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

**O D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If antitrust, then A governs)*

**O  E. General Civil (Other)   OR   O  F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(3)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
5 U.S.C. Sec. 702 (2007), and 28 U.S.C. Sec. 1331 (2007) -- Review of arbitrary, capricious denial of relief, unsupported or contrary to law.

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND: YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE Feb. 6, 2008   SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.