# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GEORGE W. WAGNER, JR.** | |
| **Plaintiff** | **Case No. 1:08–cv–0213–RMU** |
| **v.** | |
| **PETE GEREN** | **Judge Ricardo M. Urbina** |
| **SECRETARY OF THE ARMY** | |
| **Defendant** | |

## PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT
## AND OPPOSITION TO DEFENDANT'S SUMMARY JUDGMENT MOTION

Plaintiff George W. Wagner, Jr., through Counsel, respectfully moves for summary judgment pursuant to Fed. R. Civ. Pro. 56 because there is no genuine issue as to any material fact, and Mr. Wagner is entitled to summary judgment as a matter of law.

In support of this motion, Mr. Wagner submits a memorandum of points and authorities, a statement of material facts not in genuine dispute, and a draft proposed order. Defendant has filed the Administrative Record (AR) cited throughout Mr. Wagner's supporting memorandum.

Respectfully submitted,

June 16, 2008

    */s/  Lynn I. Miller*
Lynn I. Miller, #941559
James R. Klimaski, #243543
Klimaski & Associates, P.C.
1625 Massachusetts Avenue NW – Suite 500
Washington, DC  20036-2245
202-296-5600
Miller@Klimaskilaw.com
Klimaski@Klimaskilaw.com

***Attorneys for George W. Wagner, Jr.***

---

**Certificate of Service**

I certify that the foregoing ***Plaintiff's Cross Motion for Summary Judgment and Opposition to Defendant's Summary Judgment Motion*** along with a supporting memorandum of points and authorities, the statement of material facts, and a proposed order will be served to the following counsel for Defendant in this case by the Court's CM/ECF system after proper filing of an Adobe PDF version of these items on the Court's secure website on June 16, 2008:

Lanny Acosta
Special Assistant U.S. Attorney
Civil Division
555 Fourth Street NW
Washington, DC  20530
Fax:  202-514-8780

*/s/ Jon Pinkus*
Jon Pinkus
Klimaski and Associates, PC

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GEORGE W. WAGNER, JR.

      Plaintiff

      v.

PETE GEREN
SECRETARY OF THE ARMY

      Defendant

Case No. 1:08–cv-0213-RMU

Judge Ricardo M. Urbina

June 16, 2008

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS CROSS MOTION FOR SUMMARY JUDGMENT AND HIS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff George W. Wagner, Jr., through counsel, respectfully submits this Memorandum of Points and Authorities in Support of his Motion for Summary Judgment, pursuant to Fed. R. Civ. Pro. 56, and his opposition to Defendant's motion for summary judgment.

There is no genuine issue of material fact, and Mr. Wagner is entitled to judgment as a matter of law. The decisions of the Army Board for Correction of Military Records ("Corrections Board, or Board") were arbitrary and capricious, contrary to law or regulation or lacking substantial evidence.

## I. STATEMENT OF FACTS.

Mr. Wagner refers the Court to Plaintiff's Statement of Material Facts To Which There Is No Genuine Dispute accompanying this memorandum.

## II.  LEGAL STANDARDS.

### A.  Summary Judgment Standard.

Summary judgment is appropriate when the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.RCiv.P. 56(c).  The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Materiality is "a function of the applicable legal standard."  Kowalczyk v. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996).  A genuine issue is one that, if resolved, establishes a claim or defense, affecting the action's outcome.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

### B.  Standard of Review.

While the judicial standard of review under the APA is deferential, such review is not negligible, as Defendant contends.  (Def. Memorandum at 6-8).  Rather, as the District of Columbia Circuit has explained:

> The critical elements of [judicial review of an agency action] are clear.  While the decision of the agency is "entitled to a presumption of regularity," the presumption "is not to shield ... [agency] action from a thorough, probing, in-depth review."

United States Lines v. Maritime Comm'n, 584 F.2d 519, 526 (D.C. Cir. 1978), citing, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971).

Although the Circuit Court acknowledged that the "arbitrary or capricious" standard "is a narrow one," it noted that:

> ... the court's inquiry must be "searching and careful" and the court must ensure "both that the [agency] has adequately considered all

> relevant factors" ... and that it has demonstrated a "rational
> connection between the facts found and the choices made."

United States Lines, 584 F.2d at 526.

As the Fourth Circuit explained:

> ... deference is not abdication. The court must find that the relevant
> factors upon which the decision is based are supported by some
> evidence.

Zeneca, Inc. v. Shalala, 1999 U.S. Dist. LEXIS 12327, at 5 (4th Cir. August 11, 1999).

Lastly, the Court of Federal Claims explained that:

> Corrections boards must examine relevant data and articulate
> satisfactory explanations for their decisions. ... This includes
> making rational connections between the facts found and the
> choices made. ... A court may find a correction board's decision
> arbitrary and capricious if the board entirely fails to consider an
> important aspect of a problems, offers an explanation for its
> decision that runs counter to the evidence before the board, or is so
> implausible that it could not be ascribed to a difference in view or
> the product of board expertise.

Van Cleave v. United States, 66 Fed. Cl. 133, 136 (2005).

This Court, therefore, should not unconditionally defer to the Board's ruling, but must

conduct a "searching and careful" investigation into the facts of Mr. Wagner's case.

### III.  ARGUMENT.

### A.  No Evidence Exists to Prove that
### Mr. Wagner Waived Sanctuary Prior to the
### Start of His ADSW Tour in July 1994.

Defendant admits that the Board did not dispute that Mr. Wagner had over 18 years of

active service before he began his ADSW tour in July 1994.  (Def. Mem. at 11).  Given this

amount of time served, Mr. Wagner was entitled to sanctuary.

Defendant, however, claims that Mr. Wagner waived sanctuary.  Defendant bases its entire argument on the assumption that Mr. Wagner signed DA Form 1058-R, containing the printed statement:

> I understand that, although at the completion of my tour, I may be within 2 years of qualifying for an active duty retirement under 10 U.S.C. 1293, 3911, or 3914, it is current Army policy that I will be released from active duty at the completion of my tour unless my continued retention on active duty is considered in the best interests of the Army the by Assistant Secretary of the Army (Manpower and Reserve Affairs).  I hereby consent to being ordered to active duty for the period indicated and consent to my release from active duty at the completion of the tour.

(Army Reg. 135-200, ¶ 6-6(c), Update 22, effective 1 June 1990).

Defendant, following the Board's lead, places the responsibility upon Mr. Wagner to have provided Form 1058-R to the Board, stating:

> Plaintiff did not provide the form [1058-R] to the ABCMR to prove that he waived the sanctuary provision (or to demonstrate the strike threat provision (sic) and thus refused to waive sanctuary).  (AR 76.)

(Def. Mem. at 12).

Defendant, however, mischaracterizes the Board's approach to the missing form.  The Defendant's record citation, AR 76, is to the Board's 2 September 2005 Record of Proceedings, "Discussions and Conclusions," ¶ 7, concerning Form 1058-R.  The Board there said:

> 7.  The Applicant's DA Form 1058-R for the ADSW period in question is not available.

The Board does not explain why Form 1058-R is not available; *i.e.,* why the form is not in Mr. Wagner's personnel file or other Army files.  Rather, the Board argues that Mr. Wagner did sign the form, stating:

> However, the current version of the form is dated July 1993 and so was also the form the applicant would have completed. The required statement is pre-printed in item 24; therefore, the statement could not have been left off the form inadvertently. Administrative regularity is presumed. Therefore, it appears the applicant was not involuntarily released from active duty and so the sanctuary provisions of Title 10, U.S. Code, section 12686(a) did not apply to him.

Id.[1]

This presumption of administrative regularity is erroneous. The Army has the responsibility to retain such documents in its file. The responsibility is not on the military member, as the Board and the Defendant insist.

Moreover, the Board did not provide and the record does not contain any witness statement that Mr. Wagner signed Form 1058-R.

The Defendant and the Board cannot rely on a presumption of administrative regularity, given the circumstances surrounding Mr. Wagner's ADSW assignment. The July 29, 2006, Advisory Opinion, discussed these circumstances in detail. (AR 87-88, ¶¶ 4.a. (1)-(2)). First, the Advisory Opinion stated:

> a. It appears that Orders 100-021 were hastily prepared. The SGM [Wagner] was ordered to report to the ARNGRC (Army National Guard Readiness Center) Arlington, VA on 22 July 2004. Because the orders were issued late, they were verbally confirmed by the Adjutant General, DC.

Id. at 87, ¶ a.

Second, the Advisory Opinion pointed out that the tour's purpose "clearly establishes" that "this tour should have been ordered under Title 10, U.S. Code although it erroneously states

---

[1] This citation is also at AR 23.

that it was 'in support of MDW' (the military district of Washington).  The ARNGRC is a Field

Operating Activity of the National Guard Bureau and, thus, Headquarters, Department of the

Army.  There is no supporting relationship from the Readiness Center to the MDW and, while

the DCNG supports MDW extensively, the citation in this order, for the purpose of this period of

ADSW, was erroneous."  Id. at 87-88, ¶ (1).

Concerning the erroneous authority cited for Mr. Wagner's ADSW, the Advisory Opinion

further explained:

> The authority cited is "Title 32 USC 502(f)" which is full-time
> National Guard duty or FTNGD.  This form of active service is
> performed under state control (the District of Columbia ... [is]
> treated as [a state] for purpose of reference in numerous cases in
> Titles 10 and 32....)  The citation should have read "Title 10 USC
> 672(d)."  Note: On 5 Oct 94, that citation was re-codified in title 10
> as section 12301(d).  ...

Id. at 88, ¶ (2).

The Board agreed with the Advisory Opinion's determination that the Army cited the

wrong statutory provision as authority for Mr. Wagner's assignment. (AR 75, ¶ 1).

> 1.  It appears the applicant's original ADSW order incorrectly cited
> Title 32, U.S. Code, section 502(f), as the authority.  As the
> advisory opinion noted, the applicant was order to report the
> ARNG Readiness Center, a Field Operating Activity of the NGB.
> In accordance with the advisory opinion and Army Regulation 135-
> 200, the authority should have read "Title 10 USC 672(d)."

The Board granted Mr. Wagner relief on this issue by "changing the authority cited in

Headquarters, District of Columbia National Guard Orders 100-21 dated 23 July 1994 to read

'Title 10 USC 672(d).'"  Id. at 14, ¶ 1, a.

The Army's hasty preparation of the papers, the late orders and the mistaken reliance on Title 32 for the ADSW support Mr. Wagner's position that he never signed the waiver of sanctuary form.  The Army never gave Mr. Wagner the form to sign.

Further, the Army's position on the waiver form is preposterous.  The Army blames Mr. Wagner for the absence of the form and asks this Court to presume that Mr. Wagner did fill out the form.  Given the Army's position, it is Mr. Wagner's burden to prove a negative — that he never agreed to or signed the waiver of sanctuary.

The Army should bear the burden of proof that the signed waiver form exists.  The Army should explain why it did not retain the form in Mr. Wagner's personnel, or any other, file.

For the Army to succeed on the waiver form matter, it must provide the signed form. This Court should not permit the Army to escape its responsibility for record retention by simply stating that the waiver form "is not available."  Doing so is not deference, but full-scale abdication of the Court's right and responsibility to review potentially improper agency action.

## B.  Mr. Wagner Is Entitled to a 20-Year Service Retirement.

The Army admits that Mr. Wagner served 18 years, 3 months and 26 days of active duty upon his release from his ADSW tour on September 29, 1994.  (Def. Mem. at 13, citing AR 202-04).  When Mr. Wagner entered his ADSW tour on July 22, 1994, he had credit for active duty points of 18 years, 1 month and 23 days.  (AR 202-04).

Therefore, as stated previously, Mr. Wagner was entitled to sanctuary when he began the ADSW assignment.  Moreover, the July 29, 2005, Advisory Opinion pointed out that:

> The SGM had more than 18 years of active service when he reported for ADSW.

(AR 94 at ¶ (3)).

Defendant again argues that because Mr. Wagner waived sanctuary and consented to his release from the ADSW tour on September 29, 1994, he cannot make a claim for a 20-year service retirement.  As Mr. Wagner has discussed in the previous section, there is no evidence, *i.e.,* the actual Form 1058-R, to prove that Mr. Wagner did waive sanctuary.

Therefore, Mr. Wagner is entitled to credit for 20-years service because he did not, and the Army cannot prove that he did, waive sanctuary.  The Army should have permitted Mr. Wagner to remain on active duty for the additional 20 months necessary to qualify for a 20-year service retirement.  The purpose of sanctuary is to avoid what happened to Mr. Wagner — denial of the opportunity to a service member close to retirement to complete sufficient service to permit him to retire.

### C.  Mr. Wagner Is Entitled to a Medical Disability Retirement.

Mr. Wagner is entitled to medical disability retirement based on: (1) 10 U.S.C. § 1201 (2008), "Regulars and members on active duty for more than 30 days: retirement"; (2) Army Regulation 635-40, "Physical Evaluation for Retention, Retirement or Separation" (August 15, 1990) (Def. Ex. E); and (3) the fact that Mr. Wagner incurred his PTSD during his ADSW tour.

### 1.  The Statutory and Regulatory Framework for Military Disability Retirement Provide Authority for Mr. Wagner's Medical Retirement.

A review of the statute and regulations providing for disability retirement of service members in supports Mr. Wagner's claim.  The statute, 10 U.S.C. §1201 (2008), requires that the member incur the disability entitled to basic pay, §1201(a)& (c); the member be unable to perform the duties of his or her office, grade, rank, or rating because of the disability; Id.; the disability be permanent, §1201(b)(1).

Mr. Wagner meets the requirements of 10 U.S.C. §1201 (2008).  He incurred his disability, PTSD, during the course of active duty, the ADSW tour, when he was entitled to basic pay; because of the PTSD, he could not perform his duties, and his PTSD is permanent.

The applicable regulations for disability retirement in force in 1994 are contained in Army Regulation 635-40, "Physical Evaluation for Retention, Retirement, or Separation," dated August 15, 1990 (Def. Ex. E).  The regulation states a number of presumptions concerning the soldier's disability.  (Army Reg. 635-40, ¶ 3-2 Presumptions).  The presumptions relevant to Mr. Wagner are:

> a.  *Before and during active service.*
>
> (2) Any disease or injury discovered after a soldier entered active service, with the exception of congenital and hereditary conditions, was not due to the soldier's intentional misconduct or wilful neglect and was incurred in line of duty (LD).
> ...
>
> (4) Acute infections and sudden developments occurring while the soldier is in military service will be regard as service-incurred or service-aggravated.
> ...
>
> (5) The foregoing presumptions may be overcome only by a preponderance of the evidence, which differs from personal opinion, speculation, or conjecture.  When reasonable doubt exists about a soldier's condition, an attempt should be made to resolve the doubt by further clinical investigation and observation and by consideration of any other evidence that may apply.  In the absence of such proof by the preponderance of the evidence, reasonable doubt should be resolved in favor of the soldier.

The Army bears the burden of disproving these presumptions.  Indeed, the Army must present substantial evidence to rebut these presumptions.  <u>Siegel v. United States</u>, 148 Ct. Cl. 420 (1960).

The Board did not discuss or make any findings concerning these presumptions.  In its September 22, 2005, decision, the Board referred only to the regulation's provisions about the standard for finding that the service member cannot perform his or her duties, the provision that certain abnormalities or conditions lead to the conclusion that the condition existed prior to the service member's entering the military and the laws that soldiers who sustain or aggravate physically unfitting disabilities must meet certain line of duty criteria to receive retirement and severance pay benefits.  (AR 20, ¶¶ 30-31).

Nor did the Defendant address these presumptions in its memorandum.  The Defendant discussed only ¶ 3.*b*.  *Processing for separation or retirement from active service.*  (Def. Mem. at 13-14).  Defendant would have the Court focus only on these procedural provisions in determining Mr. Wagner's case.

The Board's ignoring the presumptions favoring the service member in Army Reg. 635-40 at ¶ 3-2*a* was arbitrary and capricious and contrary to law and regulation.

### 2.  Mr. Wagner's PTSD Began and Was Diagnosed During the ADSW Tour and Defendant's Case Authority Discussing the Non-Binding Nature of VA Disability Findings on Correction Boards Is Irrelevant.

Mr. Wagner's PTSD manifested itself and was diagnosed during the ADSW tour.  The IRS levy and the Army Accounting Service deduction from Mr. Wagner's paycheck during the tour precipitated the PTSD.

Mr. Wagner's medical record from his active duty on the ADSW assignment showed that

he suffered from mental conditions, depression, and PTSD.  As the July 29, 2005, Advisory

Opinion noted:

> Sergeant Major Wagner's first apparent onset of Post Traumatic
> Stress Disorder (PTSD) was at his medical appointment at
> WRAMC on 19 Sep 94, almost two months after starting his
> ADSW tour.

(AR 89, Section 5, ¶ c).

A medical record from Mr. Wagner's ADSW tour supports the above statement.  This

medical record is a "Consultation Sheet" from the WRAMC OPC (Walter Reed Army Medical

Center Outpatient Clinic) dated October 19, 1994, two weeks after Mr. Wagner's tour ended (AR

639). [2]  This record states under the box "Reason for Request":

> [Patient] is 48 yo divorced BM NG E9 who has had 2 mo [history]
> of frustration despair & anxiety re: financial concerns/housing was
> followed in OPC [outpatient clinic] 19 Sep - 14 Oct for grief
> therapy/crisis prn Ativan for insomnia Pt not currently AD [active
> duty]  Please reevaluate for continuing grief/crisis therapy

Id.

The consultation report, dated October 21, 1994, stated that:

> For the last 3-4 weeks felt overwhelmed by adverse circumstances,
> IRS took [unintelligible] of his pay, trying not to be
> [unintelligible], crys (sic) while talking about it he feels depressed
> afraid to trust people fair [unintelligible] ... difficulty in
> concentrating, his present problems bring back memories of Viet
> Nam, flashing thru his mind, he is undecided about attending
> PTSD groups
>
> depression,  **PTSD**, refer to Dr. Moore for possible psychotherapy

---

[2]  This medical record appears in other parts of the Administrative Record.

Pr Prozac ... Trazodone

<u>Id</u>. (Emphasis added).[3]

Given this evidence, it was arbitrary and capricious for the Correction Boards to find that

Mr. Wagner's PTSD and other mental problems were not incurred in the line of duty.  As the

July 29, 2005, Advisory Opinion concluded:

> (4) The defining event in his emotional state must be presumed to
> be the collection of funds not due and the severe consequences on
> his daily life.  There seems to have been a rush to judgment that the
> PTSD existed, or at least the causative factors existed, before the
> state of the period of ADSW while the sum of the evidence, other
> than the SGM's service in Vietnam, does not appear to support
> that.

(AR 94).

The Advisory Opinion also determined that:

> (5) The SGM's repeated medical appointments can be presumed to
> have affected the responsible individuals' decision making process
> as to whether the SGM should continue on the project in the new
> fiscal year.  This, too, ... would be reasonable as the individual's
> availability to perform the duties would be doubtful.

<u>Id</u>.

---

[3]  The August 13, 2004, Correction Board reported the this medical record was

> ... authenticated on 20 December 1994 by Captain JG and a
> Medical Corps major ... assigned to WRAMC Outpatient
> Psychiatry Services.  The DA Form 2173 states that this was a
> follow-up evaluation of the applicant subsequent to his initial visit
> to WRAMC on 19 September 1994.

(AR 280 at ¶ 15).

-12-

Indeed in a March 17, 1995,[4] letter denying Mr. Wagner's request for an Inspector

General Action, Col. John T. Wilcox of the Center, Inspector General, stated that;

> a. You were seen as a patient in this Outpatient Psychiatry Clinic
> on five occasions between September 19, 1994 and October 4,
> 1994.

(AR 385).

Defendant's discussion about the differences between the difference between the Army

and the Board's standards for awarding disability retirement and the VA's standards is irrelevant.

(Def. Mem. at 14-17). In this regard, Defendant cites a number of cases, but relies mainly on

Banerjee v. United States, 77 Fed. Cl. 522 (2007), and Kidwell v. Surgeon General of the United

States, No. 90-345, 1991 U.S. Dist. LEXIS 7405 (D.D.C. May 31, 1991).

Banerjee is inapposite to this case. There, the service member did not show symptoms of

her mental illness before her discharge in 1991. Banerjee, 77 Fed. Cl. at 524. The VA did not

award her a 100 percent disability for mental illness until 2000, with an effective date of 1998,

seven years after her discharge. Id. at 528. In 2000, the service member filed her application for

a medical discharge with the Army Corrections Board. Id. None of the medical evidence the

member submitted to the Board included documentation showing  mental illness while she was

in the Army.

In Kidwell, the service member received a general discharge in 1977 after two incidents

of unauthorized leave. 1991 U.S. Dist. LEXIS 7405 at *1. In 1988, the member filed an

application with the Army Corrections Board for a medical discharge due to PTSD, which the

---

[4] The letter is dated "1994," but this year is incorrect because the letter refers to events
that occurred in Fall 1994.

Social Security Administration (SSA) had found.  Id. at *2 & *8.  The Kidwell court found that

the SSA medical finding and grant of disability did not demonstrate that the service member was

medically unfit for service at the time of discharge.  Id. at *7-9.

Moreover, here, the Defendant cannot seriously claim that Mr. Wagner was fit for duty

after its assertion in the previous argument that Mr. Wagner was not entitled to a 20-year service

retirement.  As Defendant there stated:

> Even though Plaintiff and the unit apparently thought he was fit to
> serve at the beginning of October 1995,[5] Plaintiff never attended
> any drills or served on active duty again to qualify for a 20 year
> active duty service retirement.

(Def. Mem. at 13).

The evidence clearly shows that Mr. Wagner developed PTSD prior to the end of the

ADSW tour and that the Army Accounting Service's collecting a payment to the IRS after the

agency lifted the levy triggered the PTSD.  Therefore, Mr. Wagner incurred this medical

condition in the line of duty.  For the Corrections Board to find otherwise was arbitrary,

capricious and unsupported by substantial evidence.

---

[5] Defendant's reference to "1995" appears to be a mistake.  Defendant meant "1994."
The Army attempted to extend Mr. Wagner's ADSW tour "by 179 days into FY 95."  This
extension would have begun in October 1994.  (Def. Mem. at 13).  Any other reading is illogical.

**D.  The Correction Boards' Presumption that
Mr. Wagner Had Served Fewer than 18 years at the
Time of the ADSW Was Arbitrary, Capricious and Lacked
Substantial Evidence.**

The July 29, 2005, Advisory Opinion also discussed the mistaken assumption by the

various Correction Boards that Mr. Wagner had only 16½ years of service prior to entering the

ADSW tour.

> (3) The SGM had more than 18 years of active service when he
> reported for ADSW.  **The repeated, general assumption through
> the several applications to the board and, in once case, by the
> board itself, that the SGM only had 16½ years of active service
> appears to be based on what constitute active service.**  Had
> responsible individuals in the office of the DCARNG Director of
> Personnel or G-1 computed a Statement of Service each time the
> SGM was ordered to active duty for any purpose other than
> training, and established a Basic Active Service Date, the SGM's
> total active service would have been evident.  Instead, all the
> reviewers at the different times in the sum of these cases held that
> the SGM only had approximately 16½ years of service.  They each
> erroneously considered that because the SGM was in what we call
> an IDT status — or a paid-drill status — those active service points
> in the "AD Pts" column of the NGB Form 23-series had no bearing
> on this matter.

(AR 94).

The January 27, 2005, letter from the Corrections Board concerning Mr. Wagner's

October 5, 2004, application to the Board stated:

> At the time you separated from active duty in September 1994 you
> had approximately 17 years of active Federal service.

Id. at 209.

A "Report of Separation and Record of Service," dated January 15, 1996, mistakenly

showed that Mr. Wagner had 16 years, 4 months and 24 days of service.  Id. at 651.  A

"Certificate of Release or Discharge From Active Duty," also dated January 15, 1996, reported

Mr. Wagner's total years of service as 16 years, 4 months and 24 days.  Id. at 652.  These reports,

issued about 2 years after Mr. Wagner's ADSW tour ended in September 1994, are incorrect

concerning the years of service.[6]

As a result of these miscalculations concerning Mr. Wagner's period of service, the 2005

Advisory Board recommended:

> a.  Nullify the termination of the ADSW tour based on the absence
> of or flawed service computations.

Id. at 95.

### E.  Defendant's Description of the Correction Boards' Decisions Does Not Take into Account the Boards' Failure to Correctly Rule on Crucial Issues.

Defendant describes the 2002, 2004, and 2005 Correction Boards' decisions and argues

that the Boards' denials of Mr. Wagner's applications for disability retirement were correct.

(Def. Mem. at 17-21).  This position is unjustifiable because the Boards' rulings on several

critical issues were arbitrary and capricious, unsupported by substantial evidence and failed to

follow the relevant laws and regulations.

First, the 2005 Board discounted Mr. Wagner's contention that he never signed Form

1058-R before entering his ADSW tour and therefore never waived sanctuary.  The Board admits

that:

> 7.  The Applicant's DA Form 1058-R for the ADSW period in
> question is not available.

---

[6]  This miscalculation of service time may also be the reason that the Army did not
provide Mr. Wagner with Form 1058-R because the Army erroneously believed he was not even
close to sanctuary and thus did not have to file a waiver.

(AR 76, ¶ 7).

However, the Board, as discussed previously, never explains why Form 1058-R is not in Mr. Wagner's personnel file or other Army files. Rather, the Board simply assumes that Mr. Wagner did sign the form, relying on administrative regularity. Id. This conclusion is arbitrary and capricious.

Second, the Boards did not take into account the presumption in favor of finding that the military member's medical condition was incurred in the line of duty. As discussed above, these presumptions are described in Army Reg. 635-40, ¶ 3-2 Presumptions, *a. Before and during active service.* By not making any findings about these presumptions, the Boards failed to follow laws and regulations.

Third, the Boards ignored the medical evidence that Mr. Wagner suffered from PTSD prior to the end of his ADSW tour. This medical evidence is, as discussed above, the October 19, 1994, Walter Reed Outpatient Center Referral to the VA for Mr. Wagner's further treatment for the condition that he suffered during the tour, *i.e.,* PTSD. (AR 297).

Indeed, in a March 17, 1995, letter denying Mr. Wagner's request for an Inspector General Action, a member of the Inspector General's office stated:

> a. You were seen as a patient in this Outpatient Psychiatry Clinic on five occasions between September 19, 1994 and October 4, 1994.

(AR 385).

The only reason that the Walter Reed Outpatient Clinic referred Mr. Wagner to the VA was that his ADSW tour ended. Yet the Boards ignored the clear medical evidence of PTSD beginning during the tour. Had Mr. Wagner's tour not arbitrarily been cut short at the end of

September 1994, he would have still received treatment and the diagnosis at Walter Reed while

on active duty.  Indeed, as the 2004 Corrections Board noted:

> Records show that, on 21 October 1994 [after his separation from
> his Title 10 ADSW tour of duty], the DVA found the applicant
> suffered from PTSD.  ...

(AR 17, at ¶ 14).  It defies logic for the Boards to conclude that Mr. Wagner did not suffer from

PTSD only a month before.  This ruling is arbitrary and capricious and not supported by

substantial evidence.

Fourth, the 2005 Board refused to change the "Phase of Life" diagnosis Mr. Wagner

received in December 1994.  Mr. Wagner will address why this decision was arbitrary and

capricious after this section.[7]

Fifth, the 2005 Board's refusal to correct the appointing authority's reversal of the Line of

Duty determination finding that Mr. Wagner suffered from "Mental Post traumatic" in the line of

duty to not in the line of duty and not PTSD was arbitrary and capricious.  Mr. Wagner will also

---

[7]  The Court should note that the 2005 Board did change the DA Form 2173, dated
December 20, 1994, which improperly concluded that Mr. Wagner's financial situation improved
while he was on the ADSW tour.  (AR 25 at 1b.)  In ruling on this issue, the Board explained:

> The applicant contended the DA Form 2173 initiated on 20
> December 1994 improperly mentioned his "... financial situation
> improved ..." while he was on that period of duty.  Based upon the
> fact DFAS deducted $1,238 from his 31 August 1994 pay for the
> IRS after he had been released from the IRS levy, there is sufficient
> evidence to show his financial situation was not improved during
> that period of duty.  Therefore, the DA Form 2173 should be
> amended to delete the phrase "... and actually improved while on
> active duty" in item 11.

Id. at ¶ 12.

discuss this issue, *supra*.  The Report of Investigation Line of Duty and Misconduct Status is in the record at AR 101-02.

### F.  The 2005 Board's Refusal to Change the 1994 "Phase of Life Problem" Diagnosis Was Arbitrary and Capricious, Contrary to Law or Regulation or Not Supported by Substantial Evidence.

Mr. Wagner requested in his 2005 Correction Board application that the Board delete the "phase of life" diagnosis on the December 20, 1994, Department of the Army (DA) Form 2173. Contrary to Defendant's claim, the Board's refusal to delete this diagnosis was arbitrary and capricious, contrary to law or regulation or not supported by substantial evidence.  Specifically, the Army's December 1994 diagnosis conflicted with that provided in the Walter Reed outpatient clinic consultation sheet dated October 19, 1994.  (AR 639).

The referring doctor from Walter Reed reported that Mr. Wagner was suffering, for three months, from frustration, despair and anxiety because of his financial and housing crisis.  Id.  As to the latter, Mr. Wagner was homeless for lack of money.

The October 21, 1994, consultation report diagnosed Mr. Wagner as suffering from PTSD and depression.  That physician prescribed Prozac and Trazodone, both anti-depressants.  (AR 639).

Further, a medical progress note of December 5, 1994, indicates that Mr. Wagner was suffering from a severe depressive condition.  Id. at 634.  The record notes in part:

> Pt claims to have difficulty in functioning; does not remember things, avoiding people.
>
> He sees Dr. [unintelligible] for psychotherapy
>
> Pt. is fighting not to regress, avoiding hospitalization

> he was offered hospitalization in Walter Reed Sept 94
>
> he refused
>
> Today he seems [unintelligible] difficulty in articulating his complaints; He is considering to go back to Walter Reed
>
> He on the verge of crying; appears depressed; with somatic complaints
>
> Pt is advised to accept hospitalization
>
> ...
>
> Prozac [dosage]
>
> Trazodone [dosage]

Id.

The Court should note that the above record mentions that the physicians, most likely those at the Walter Reed Outpatient Center, suggested hospitalization for Mr. Wagner in September 1994, when he was still in the ADSW tour.  This suggestion supports a finding that Mr. Wagner was suffering PTSD and that "phase of life" problem was an incorrect diagnosis.

Given the above medical evidence, Defendant cannot argue that the Board's discussion of the DSM-IV definitions of "phase of life" problem, PTSD and acute stress disorder was the correct approach.

Nor does Mr. Wagner's acknowledging that his condition arose from the financial crisis with the IRS levy and the DFAS's deducting the tax amount after the IRS lifted the levy change the PTSD diagnosis.

Moreover, there is no suggestion in the 2005 Board opinion that the Board members conferred with psychiatrists about whether Mr. Wagner's mental breakdown was merely a "phase

of life" problem or PTSD.  Only a psychiatrist could properly make this determination, not a group of lay persons.

In conclusion, the medical records and treatment for PTSD controvert the Defendant's position that the Board's refusal to delete the "phase of life" diagnosis from Form 2173 was correct.

By ignoring the clear medical evidence, the Board's decision was arbitrary and capricious and unsupported by substantial evidence.

### G. The 2005 Correction Board's Refusal to Correct the Line of Duty Determinations Was Arbitrary or Capricious, Contrary to Law and Regulation and Not Supported by Substantial Evidence.

Once again, Defendant's argument is simply to describe  the 2005 Correction Board's reasoning and the evidence the Board weighed before refusing to correct the two Line of Duty determinations, dated April 2005 (AR 101-02) and January 1995 (AR 167).  (Def. Mem. at 23-26).  Defendant, however, does not explain or justify how and why the Board ignored the medical records, described previously, which contained a diagnosis of PTSD.  Id. at 634 & 639.

The January 1995 LOD report claimed that Mr. Wagner's:

> Emotional concerns were precipitated by financial problems which started the first of July 1994, prior to start of active duty service.

Id. at 167.  However, as Mr. Wagner has previously discussed, his mental breakdown began when the Army financial service deducted the IRS levy amount in August 1994, despite the lifting of the levy, and then advised Mr. Wagner to deal with the IRS about the overpayment.[8]

_____

[8]  Additionally, as Mr. Wagner previously discussed, the 2005 Correction Board did correct the 1995 LOD report, deleting the finding that Mr. Wagner's financial problems "actually improved while on active duty."

The April 2005 LOD investigating officer found that Mr. Wagner was not mentally sound and that Mr. Wagner's condition was in the line of duty. In the "Remarks" section of the LOD report, the investigating officer noted that, "Soldier needs to seek continuous medical care for illness." Id. at 101.

The Appointing Authority, however, disapproved the LOD finding and stated:

> APPROVED: NOT IN LINE OF DUTY-NOT DUE TO OWN MISCONDUCT for post traumatic stress disorder.
>
> NOTE: After extensive review by the staff of the Office of the Surgeon and Judge Advocate, National Guard Bureau, we have found nothing to support Post Traumatic Stress Disorder upon entrance to Active Duty in July 1994. All evidence points to an elevated anxiety due to a personal monetary problem about the time order to active duty.

Id. at 102.

The error in this determination is the focus on the question of whether the PTSD existed at the time that Mr. Wagner **entered** the ADSW tour. This is not the question. Of course, no medical records exists that show or suggest that Mr. Wagner suffered from any sort of mental trauma or anxiety upon entering the ADSW tour. The first report of Mr. Wagner's suffering from a mental problem was in the Walter Reed Outpatient referral for consultation. This record stated that Mr. Wagner's mental trauma began on September 19, 1994. Id. at 639. Therefore, the April 2005 not in the line of duty determination investigation by the appointing authority is irrelevant.

The July 29, 2005, Advisory Opinion summed up Mr. Wagner's medical problem best:

> c. The SGM's condition should either be considered in line of duty either through manifestation of a condition in line of duty while serving on active duty or through aggravation of a condition in line of duty while serving on active duty. **The unwarranted collection**

> **of significant funds from his pay was clearly outside the control of the SGM. That should not be considered as a "... phase of life ..." event and dismissed with a referral to the VA.**

(AR 95). (Emphasis added.)

The reasoning for the above conclusion was:

> (4)  The defining state in [Mr. Wagner's] emotional state must be presumed to be the collection of funds not due and the severe consequences on his daily life. There seems to have been a rush to judgment that the PTSD existed, or at least the causative factors existed, before the start of the period of ADSW while the sum of the evidence, other than the SGM's service in Vietnam, does not appear to support that.

> (5)  The SGM's repeated medical appoints can be presumed to have affected the responsible individuals' decision making process as to whether the SGM should continue on the project in the new fiscal year. This, too, ... would be reasonable as the individual's availability to perform the duties would be doubtful.

Id. at 94.

> (8)  The results of continued medical care and establishment of a line of duty determination through formal investigation would have lead (sic) to either a medical separation or medical retirement, either temporary or permanent.

Id. at 95.

The Advisory Board then made the following recommendations:

> b.  Nullify the DA Form 2173, Statement of Medical Condition and Duty Status completed in January 1995.

> c.  Accept the findings of the formal line of duty investigation performed by MAJ Pindell in April 2005 that the SGM's condition manifested itself while on duty and that it be in line of duty.

> d.  Award the SGM a retirement from active service for medical disqualification as of a reasonable date such disqualification would have been made by WRAMC and when he would have been processed for such a retirement.

-23-

<u>Id</u>.

This is not a case where "there is such relevant evidence as a reasonable mind might accept as adequate to support the [agency's] conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 564 (1988). The 2005 Correction Board totally disregarded the medical evidence that Mr. Wagner suffered from PTSD beginning in September 1994, when he was on active duty. The Board also based its decision on the erroneous assumption that the financial problems occurred before Mr. Wagner began serving the ADSW tour.

The fact that the Board reviewed all the evidence does not justify its refusal to correct the not in the line of duty findings. The Court should find that this ruling was arbitrary and capricious and not supported by substantial evidence.

### H. Remand of This Case to the Corrections Board Is Necessary to Correct All the Board Decisions, Which Were Arbitrary and Capricious, Contrary to Law Or Regulation or Unsupported by Substantial Evidence.

Defendant makes two arguments in this section. First, Defendant argues that the Correction Board was not arbitrary and capricious for refusing to reconsider Mr. Wagner's case when Senator Barbara Mikulski forwarded the matter in 2006. (Def. Mem. At 27). Second, Defendant argues that remand is unnecessary for remand because the 2005 and 2006 denials were not arbitrary, capricious, contrary to law or regulation or unsupported by substantial evidence.

Concerning Defendant's first argument, it is true that in his Complaint Mr. Wagner stated that: This action also concerns the ABCMR's August 4, 2006, refusal to reconsider its September 22, 2005, decision concerning Mr. Wagner's case. (Complaint at 2).

However, as the Complaint further stated, the August 4, 2006, denial also informed Mr. Wagner that he could seek relief in court. (Complaint at 13, ¶ 59; AR 61). Further, Mr. Wagner

did not request, as part of the relief sought, that the Board reverse this denial of reconsideration. Therefore, Mr. Wagner will not address this part of Defendant's argument, although he does not concede this point.

However, Mr. Wagner does maintain that, light of the arguments above, the 2005 Board's denial of relief requires remand so that the Board reconsider its action and grant the relief that Mr. Wagner seeks.

## CONCLUSION

In light of the above, Mr. Wagner respectively requests that this Court grant his cross motion for summary judgment.

Respectfully submitted,

June 16, 2008

*/s/  Lynn I. Miller*
Lynn I. Miller, #941559
James R. Klimaski, #243543
Klimaski & Associates, P.C.
1625 Massachusetts Avenue NW – Suite 500
Washington, DC  20036-2245
202-296-5600
Miller@Klimaskilaw.com
Klimaski@Klimaskilaw.com

*Attorneys for George W. Wagner, Jr.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GEORGE W. WAGNER, JR.

    Plaintiff

        v.

PETE GEREN
SECRETARY OF THE ARMY

    Defendant

Case No. 1:08–cv–0213–RMU

Judge Ricardo M. Urbina

June 16, 2008

PLAINTIFF'S STATEMENT OF MATERIAL
FACTS TO WHICH THERE IS NO GENUINE DISPUTE

      Plaintiff George W. Wagner, Jr., through counsel, respectfully files this Statement of

Material Facts to which There is No Genuine Dispute in support of his cross motion for summary

judgment.  The Administrative Record in this case supports this statement.

1.      Mr. Wagner enlisted in the Army on June 28, 1963.  (Compl. ¶ 5).[1]

2.      After serving two tours in Vietnam and one in Korea ***[cite], Mr. Wagner received an

      Honorable Discharge on November 21, 1979, with a 10% disability rating for law back

      pain.  (Compl ¶ 5; AR 652-53).

3.      On January 16, 1986, Mr. Wagner enlisted in the Army Reserve National Guard (ARNG),

      with an assignment t the District of Columbia ARNG (DCARNG).  (Compl. ¶ 6).

4.      Mr. Wagner received a promotion to Sergeant Major, E-9, effective April 12, 1992.

      (Compl. ¶ 6).

---

[1] Mr. Wagner filed a Verified Complaint.  (Compl. At 15).

5.    On July 23, 1994, Headquarters, District of Columbia National Guard, via Orders 100-21, ordered Mr. Wagner to active duty for special work (ADSW) from July 22, 1994, to September 29, 1994, under then 10 U.S.C. § 672(d), (Title 10 status), to the Military District of Washington (MDW).(Compl. ¶ 7; AR 10, 88).

6.    Mr. Wagner was to prepare a National Guard pamphlet on Stock Fund Depot Level Repairables.  (AR 88).

7.    The Army originally asked Mr. Wagner if he would be available in June 1994, but the orders were late in getting approved.  (AR 88).

8.    Although Mr. Wagner's assignment was under the authority of Title 10, the ADSW orders erroneously cited Title 32 U.S.C. § 502(c) as the authority for the assignment. (Compl. ¶ 9; AR 10).  This latter statutory provision deals with training with the National Guard, not the active Army.  (Compl. ¶ 9 & fn. 2).

9.    As of July 22, 1994, Mr. Wagner had a total of 18 years, one month and 23 days of total active service.  (Compl. ¶ 10, AR 89).

10.    A June 1, 2005, ARNG Current Annual [Retirement Points] Statement showed that at the completion of his 60-day tour on September 29, 1994, Mr. Wagner had completed 18 years, 3 months and 26 days of active duty.  (Compl. ¶ 12; AR 70, 202-04).

11.     Therefore, Mr. Wagner was entitled to sanctuary under 10 U.S.C. § 12686(a).[2] (Compl. ¶ 11; AR 89).

12.     Prior to his ADSW tour, Mr. Wagner never signed DA Form 1058-R, "Application for Active Duty for Training, Active Duty for Special Work, and Annual training for Soldiers of the Army National Guard and United States Army Reserve," which requires the signer to agree to waive sanctuary and separate from active duty at the completion of the ADSW tour.  (Compl. ¶¶ 15, 17).

13.     Mr. Wagner does not have a signed DA Form 1058-R in his possession and never received a form, signed by him, from the Army.  (Compl. ¶ 18).

14.     The Corrections Board admitted that, "The applicant's [Mr. Wagner] DA Form 1058-R for the ADSW period in question is not available."  (AR 76).

15.     The Administrative Record does not contain DA Form 1058-R.

16.     Moreover, the Army repeatedly miscalculated Mr. Wagner's time in active service.  There was an erroneous assumption that Mr. Wagner had only 16½ years of service prior to the 1994 ADSW service.  (AR 94).

---

[2]  10 U.S.C. § 12686(a) reads:

> (a) Limitation.  Under regulations to be prescribed by the Secretary concerned ... a member of a reserve component who is on active duty (other than for training) and is within two years of becoming eligible for retirement pay or retainer pay under a purely military retirement system ... may not be involuntarily released from that duty before he becomes eligible for that pay, unless the release is approved by the Secretary.

17.   A January 27, 2005, letter from the Corrections Board concerning Mr. Wagner's October

5, 2004, application to the Board stated, "As the time you separated from active duty in

September 1994 you had approximately 17 years of active Federal service."  (AR 209).

18.   A "Report of Separation and Record of Service," dated January 15, 1996, mistakenly

showed that Mr. Wagner had 16 years, 4 months and 25 days of service.  (AR 651).

19.   A "Certificate of Release or Discharge from Active Duty," also dated January 15, 1996,

reported Mr. Wagner's total years of service as 16 years, 4 months and 24 days.  (AR

651).

20.   On July 1, 1994, the IRS placed a levy on Mr. Wagner's wages.  (Compl. ¶ 19).

21.   Mr. Wagner arranged for the IRS to lift the levy.  (Compl. ¶ 21).

22.   An August 26, 1994, Form 668-D (Release of Levy/Release of Property from Levy)

released Mr. Wagner from the levy for all wages or other income owed or becoming

owed.  (Compl. 21; AR 174).

23.   The IRS sent the release to the Defense Finance and Accounting Service (DFAS).

(Compl. ¶ 21; AR 174).

24.   Despite the IRS release, the DFAS deducted $1,238.13 from Mr. Wagner's August 31,

1994, wages and sent this amount to the IRS.  (Compl. ¶¶ 20, 22; AR 633).

25.   The DFAS deduction from his August 31, 1994, paycheck placed Mr. Wagner in dire

financial straits.  (Compl. ¶ 23).

26.   When Mr. Wagner contacted DFAS personnel about withdrawing the money and sending

it to the IRS despite the lifting of the levy, DFAS personnel refused to take any corrective

action and instructed Mr. Wagner to notify the IRS himself about recovering the funds. (Compl. ¶ 24, AR 171-72).

27. On September 2, 1994, Mr. Wagner's supervisors wrote memoranda to an Army Emergency Relief (AER) officer asking for financial assistance for Mr. Wagner.  (AR 171-72).

28. One of the letters stated that, provided the FY95 funds were available, Mr. Wagner's ADSW tour would be extended for 179 days.  (AR 172).

29. This grave financial set-back resulting from the IRS levy and the DFAS deduction from Mr. Wagner's August 31, 1994, paycheck and the DFAS non-action in returning the money triggered the onset of Post-Traumatic Stress Disorder (PTSD) in Mr. Wagner. (Compl. 25, AR 89).

30. On September 19, 1994, Mr. Wagner sought treatment at the Walter Reed Outpatient Center.  (Compl. ¶ 26, AR 639).

31. Mr. Wagner visited the outpatient center five times between September 19 to October 4, 1994.  (AR 165).

32. The report on Mr. Wagner's condition when he visited the Walter Reed Outpatient Center was a history of "2 mo of frustration, despair & anxiety re: financial concerns/housing." Mr. Wagner was treated for insomnia with Ativan.  (Compl. ¶ 27; AR 639).

33. On October 19, 1994, the Walter Reed Outpatient Center referred Mr. Wagner to the VA for a consultation for a reevaluation for "continuing grief therapy/crisis, adjustment disorder with MEF [multiple emotional features] and secondary depressed.  R/O MDE [rule out multiple depressive episodes], single episode."  (AR 639).

34.    On October 21, 1994, Mr. Wagner underwent a consultation by a psychiatrist.  That

physician noted that, in respect to the "last 3-4 weeks, felt overwhelmed by adverse

circumstances, IRS took hold of his pay, trying not to be evicted, cryes (sic) while talking

about it, he feels depressed, afraid to trust people, fair appetite, fail [unintelligible], some

insomnia, [unintelligible] & difficulty in concentrating ...."  The diagnosis was

"depression, PTSD, refer to Dr. Moore for further psychotherapy."  The doctor prescribed

Prozac and Trazodone.  (AR 639).

35.     A medical progress note of December 5, 1994, indicates that Mr. Wagner was suffering

from a severe depressive condition.  This record notes in part:

> Pt claims to have difficulty in functioning; does not remember
>
> things, avoiding people.
>
> He sees Dr. [unintelligible] for psychotherapy
>
> Pt. is fighting not to regress, avoiding hospitalization
>
> he was offered hospitalization in Walter Reed Sept 94
>
> he refused
>
> Today he seems [unintelligible] difficulty in articulating his
>
> complaints; He is considering to go back to Walter Reed
>
> He on the verge of crying; appears depressed; with somatic
>
> complaints
>
> Pt is advised to accept hospitalization
>
> Pt ... with depression
>
> Prozac [dosage]

Trazodone [dosage]

(AR 634).

36.    In April 2005, the Army conducted a formal Line of Duty (LOD) investigation

concerning Mr. Wagner's medical problem.  The investigating office noted in the Report

of Investigation (DD Form 261) that Mr. Wagner suffered from "Mental Post traumatic"

and needed continuous medical care.  (AR 101).

37.    The investigating officer found that Mr. Wagner sustained the PTSD in the line of duty.

(AR 101).

38.    The Appointing Authority, however, reversed the LOD finding, erroneously focusing on

whether Mr. Wagner suffered PTSD upon his entrance to his ADSW tour in July 1994.

(AR 102).

39.    However, the October 19, 1994, medical record from the Walter Reed Outpatient Center

had noted that Mr. Wagner first presented with mental problems on September 19, 1994.

(AR 639).

Respectfully submitted,


June 16, 2008                     _/s/  **Lynn I. Miller**_____
                                 Lynn I. Miller, #941559
                                 James R. Klimaski, #243543
                                 Klimaski & Associates, P.C.
                                 1625 Massachusetts Avenue NW – Suite 500
                                 Washington, DC  20036-2245
                                 202-296-5600
                                 Miller@Klimaskilaw.com
                                 Klimaski@Klimaskilaw.com

                                 **Attorneys for George W. Wagner, Jr.**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**GEORGE W. WAGNER, JR.**

    **Plaintiff**

        **v.**

**PETE GEREN**
**SECRETARY OF THE ARMY**

    **Defendant**

**Case No. 1:08–cv–0213–RMU**

**Judge Ricardo M. Urbina**

## ORDER

    This matter comes before the Court on cross motions for summary judgment by the parties.  Based on those motions, the oppositions and replies thereto, and the entire record herein, it is this _____ day of _____, 2008, hereby

    **ORDERED** that Plaintiff's motion is **GRANTED,** and it is further

    **ORDERED** that judgment shall be entered for Plaintiff.

    This is a final, appealable order.  **SO ORDERED.**

_____
Ricardo M. Urbina
United States District Judge

Copies to Counsel
via the Court's CM/ECF notification system.