UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GEORGE W. WAGNER, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:08-cv-00213 (RMU)** |
| | ) | |
| **PETE GEREN,** | ) | |
| **Secretary of the Army,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT, AND DEFENDANT'S OPPOSITION TO
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

As argued in Defendant's motion for summary judgment ("Def. Mem."), the Army Board

for Correction of Military Records ("ABCMR" or "Board") 2005 decision was not arbitrary,

capricious, or contrary to law or regulation.  Plaintiff fails to prove otherwise, and instead,

argues that the National Guard Bureau ("NGB") advisory opinion was right and the ABMCR

conclusions denying him relief were wrong.  The ABCMR acted within its discretion and

according to law and regulation when it weighed all of the evidence Plaintiff submitted, and

provided a thorough explanation, including a rational connection between the facts found and the

choice made,  for denying his requests.  Accordingly, the ABCMR's 2005 decision should not be

disturbed and the Defendant's motion for summary judgment should be granted.

In his Cross-Motion and Opposition ("Pl. Resp."), Plaintiff re-asserts that the ABCMR's

2005 decision was arbitrary and capricious because the Board: (1) presumed the Plaintiff waived

1

the sanctuary provision and determined the Plaintiff is not entitled to a twenty year active

Federal service retirement; (2) denied the Plaintiff medical disability retirement; (3) rejected

Plaintiff's request to alter the December 1994 "Phase of Life" medical diagnosis; and (4) refused

to change the 1995 and 2005 line of duty (LOD) determinations. (Pl. Resp. 1-24.) The Plaintiff

requests this Court remand these matters to the ABCMR for a tenth time.  (Pl. Resp. 24-25.)

**I.    The ABCMR Reasonably Concluded Plaintiff Was Not Entitled To The Sanctuary Provision Or Constructive 20 Year Retirement Benefits**

**A.    The ABCMR Lawfully Presumed Administrative Regularity In Accordance With The ABCMR Regulation**

The crux of Plaintiff's argument for retirement benefits rests upon whether the ABCMR

reasonably concluded that Plaintiff waived the sanctuary provision when the Department of the

Army (DA) Form 1058-R is not available in Plaintiff's records.  DA Form 1058-R is the

application Army National Guard and U.S. Army Reserve soldiers complete in order to be

activated for Active Duty for Special Work (ADSW) tours, Active Duty for Training, Temporary

Tour of Active Duty, and Annual Training.[1]  (See AR 97-98.)  The form contains a pre-printed

paragraph waiving the sanctuary provision.  Id.  Plaintiff implies that the only way to prove

Plaintiff waived the sanctuary provision would be for Defendant to produce the form that

Plaintiff signed fourteen years ago.  (See Pl. Resp. 4-5.)  Plaintiff's argument is misguided in its

---

[1] DA Form 1058-R, dated July 1993, is titled, "Application for Active Duty for Training, Active Duty for Special Work, Temporary Tour of Active Duty, and Annual Training for Soldiers of the Army National Guard and U.S. Army Reserve."  (AR 97-98.)  The application states that the purpose of the form is to determine the eligibility and schedule individuals for active duty for special work or active duty for training on requested dates.  Id.  The form also states that "completing this form is mandatory for individuals applying for active duty for special work and active duty for training.  If not completed, you will be ineligible for the requested tour."  Id.  Due to the fact the form is required for both Title 10 ADSW tours and Title 32 Active Duty for Training tours, all National Guard and Reserve soldiers complete the application form regardless of the authority for their activation.

reliance on the production of a signed copy of the form.  The ABCMR does not dispute that the

waiver was not in Plaintiff's military records.  (AR 76.)  The only issue is whether the

ABCMR's presumption of administrative regularity was lawful and rationally based on the facts

found and the decision made.  The correct analysis is to review the Board's explanation which

reveals the Board members reached a reasonable conclusion based on the evidence that was

available.

The ABCMR properly presumed administrative regularity and concluded Plaintiff

completed the application for the activation of his 1994 ADSW tour.  (AR 76.)  The ABCMR

appropriately relied on facts from Plaintiff's 1994 ADSW tour orders and the relevant

regulations to reach its conclusion – that Plaintiff voluntarily consented to a Title 10 ADSW

tour, for a limited duration, and waived the sanctuary provision.  (AR 75-76.)  Although Plaintiff

disagrees with the result, the standard is not whether Plaintiff or this Court would reach the same

conclusion, but rather whether the ABCMR reached a reasonable conclusion.  Pierce v.

Underwood, 487 U.S. 552, 564 (1988)(holding that a court should consider whether the

"decision was based on a consideration of the relevant factors and whether there was a clear

error of judgment," but a court "is not empowered to substitute its judgment for that of the

agency."); accord Burlington Northern R. Co. v. Surface Transp. Bd., 114 F.3d 206, 210 (D.C.

Cir. 1997).

The ABCMR regulation states that "[t]he ABCMR begins its consideration of each case

with the presumption of administrative regularity.  The applicant has the burden of proving an

error or injustice by a preponderance of the evidence."  See Army Regulation (Army Reg.) 15-

185 at ¶ 2-9 (Def. Ex. A).  "A presumption of regularity in normal, customary and standard filing

3

practice cannot be overcome or rebutted by speculation." Brooks v. United States, 213 Ct. Cl. 115, 128 n. 8 (1977). Plaintiff claims he never signed the form or waived the sanctuary provision, but offers nothing else to support his allegation such as a copy of orders extending his ADSW tour by twenty months until his retirement, or evidence that the Director of the National Guard waived the 180 day limit on his ADSW tour and granted an exception to the 60-day break rule.[2]

The ABCMR appropriately relied on the evidence presented to conclude that Plaintiff waived the sanctuary provision. The regulation states that "[t]he ABCMR will decide cases on the evidence of record. It is not an investigative body." Army Reg. 15-185 at ¶ 2-2(c). The regulation also directs the ABCMR to "[d]eny applications when the error or injustice is not adequately supported by the evidence . . . ." Id. at ¶ 1-8(d). Therefore, without any evidence to support Plaintiff's claim that he never signed the form, the ABCMR lawfully and reasonably relied upon the presumption of administrative regularity when it concluded that Plaintiff completed DA Form 1058-R with the pre-printed waiver of the sanctuary provision.

**B.  The ABCMR Articulated Additional Facts From Plaintiff's Orders And Regulatory Provisions Which Indicated The Plaintiff Waived the Sanctuary Provision**

---

[2]  As explained in the Defendant's original motion, Army Reg. 135-200 stated that ADSW tours "are typically of short duration. Orders which place a soldier on active duty specify that release will occur at the end of the tour." Army Reg. 135-200 ¶1-11a(10) (Def. Ex. B). Any ADSW tour that exceeded 180 days required approval and a waiver by the Director of the Army National Guard (DARNG). (Id. at ¶¶ 1-4, 1-8.) Also, ADSW tours that lasted over 30 days in one fiscal year (FY) were not permitted to extend into the next FY. (Id. at ¶ 1-4.) A soldier who served over 30 days in the final quarter of the previous FY was required to take a 60 day break at the start of the new FY, and this was called the 60 day break rule. (Id. ¶¶ 1-4, 6-1d.) An exception to the 60 day break rule also required the approval and a waiver by the DARNG. (Id. at ¶¶ 1-4, 1-11b(9).) If the DARNG granted a waiver to the maximum 180 day limit for ADSW tours or for the 60 day break rule at the beginning of a new fiscal year, the waiver would have been included in the additional instruction portion of the orders. (Id. ¶¶ 1-11b(8), (9)).

The ABCMR also cited regulatory requirements and information on Plaintiff's orders which supported its conclusion. The ABCMR reasoned that September 29, 1994 was a logical end date because it conformed with Army Regulation 135-200 which mandates that

> if being considered for an ADSW tour in the first 2 months of a fiscal year, the soldier must have had a minimum break of 60 continuous calendar days following the last day of an ADSW tour in the previous fiscal year. The break was only required if the Soldier had accumulated over 30 days of ADSW in the last quarter of the previous fiscal year.

 (AR 75.) The ABCMR concluded "[t]he [Plaintiff] had performed more than 30 days of ADSW in the last quarter of the fiscal year 1994," from July 22 through September, 29 1994 and that by regulation, he could not have started another ADSW tour until November 29, 1994. (Id.)

The NGB advisory opinion identified the practical considerations of the regulatory 180 day limit and the 60 day break rule pertaining to Plaintiff's 1994 ADSW tour which support the ABCMR's conclusion that September 29, 1994 was a logical end date. (See AR 88.) First, ADSW tours ended on September 29th to avoid having to count those Soldiers on active duty over 180 days as being part of the Army National Guard Active Guard Reserve (ARNG AGR) end strength. (Id.) Second, Soldiers who served a stated number of days in the last quarter of the fiscal year were required to take a 60-day break in tours (unless a waiver was granted) to avoid the appearance of creating permanent tours. (Id.)

Therefore, the ABCMR reasonably concluded the orders contained information that indicated Plaintiff waived the sanctuary provision. (AR 75-76.) The ABCMR determined September 29, 1994 was a proper end date because it complied with Army Reg. 135-200 (AR 75.) Also, Plaintiff consented to being ordered to active duty for the period indicated and consented to his release from active duty at the completion of the tour. (Id.) As a result, the

information on the orders, the regulatory considerations, and the presumption of administrative regularity, led the ABCMR to conclude that Plaintiff was not involuntarily released from active duty and the sanctuary provision did not apply to him. (AR 73, 75-76.)

Plaintiff argues that the ABCMR improperly relied on the orders because the orders were allegedly hastily prepared.  (Pl. Resp. 5-7)  This contradicts Plaintiff's complaint that the Army actually took over a month to approve the orders.[3]  (Pl. Resp. Facts ¶ 7.)  The ABCMR agreed there was a typographical error at the bottom of the page of the orders which cited the authority for the activation as Title 32 and the Board required the orders to be corrected to Title 10.  (AR 9-10.)  The citation to Title 32 does not undermine the validity of the entire document or void the orders when all of the information, including the dates Plaintiff actually served his ADSW tour, the reference to Title 10, and the duty location to report to for active duty, all proved to be accurate.  (AR 10.)

The ABCMR explained in its 2004 opinion that the orders clearly indicated Plaintiff was serving a tour of a limited duration by specifically stating that his active duty serve tour only ran from July 22, 1994 to September 29, 1994.[4]  (AR 119-20.)  The instructions on the orders,

---

[3]  Plaintiff's response states that the "Army originally asked Mr. Wagner if he would be available in June 1994, but the orders were late in getting approved."  (Pl. Resp. Facts. ¶ 7.)

[4]  The ABCMR found that
> District of Columbia National Guard Orders 100-021, dated 23 July 1994, ordered the applicant to Active Duty for Special Work (ADSW) for the period 22 July 1994 to 29 September 1994 in a Title 10 status for the purpose of providing support to the Military District of Washington.  Instructions in these orders show that they were self-terminating, specifically that unless the tour of duty was curtailed or extended by competent authority the applicant was automatically removed from ADSW effective 29 September 1994 and returned to his former duty status in the DCARNG.

(AR 119-120.)

directly above the date, informed Plaintiff that he was "[o]rdered to active duty for special work

(ADSW) for the period shown plus allowable travel time.  Upon completion of the period of

ADSW unless sooner released or extended by proper authority, you will return to the place

where you entered ADSW and be released from such duty."  (AR 10.)  Plaintiff was ordered to

report to the ARNG Readiness Center on 22 July 2004.  (AR 10, 70.)  "The ARNG Readiness

Center is a Field Operating Activity of the NGB, and thus, Headquarters, Department of the

Army." (AR 71.)  This duty location information is important because it shows that Plaintiff was

in an active federal status pursuant to Title 10 working at a federal agency, rather than a Title 32

status for the DCARNG.  Based on these facts, the ABCMR determined that the "[i]nstructions

in these orders show that they were self-terminating, specifically that unless the tour of duty was

curtailed or extended by competent authority the applicant was automatically removed from

ADSW effective 29 September 1994 and returned to his former duty status in the DCARNG

[District of Columbia Army National Guard]."  (AR 119-20.)

   Plaintiff acknowledged that he knew it was a tour of limited duration when he expressed

that he had hopes of obtaining an extension once he began the project.  (AR 71, 76, 88.)  His

desire and intent to request an extension indicates he clearly knew by the dates printed on the

orders that he would not be entitled to stay on active duty beyond the limited sixty day ADSW

tour without further approval.[5]  (AR 88.)  He clearly consented to the dates on the orders and it

was reasonable for the ABCMR to presume he waived the sanctuary provision.  Plaintiff's

statement that he was informed in early October that his extension was not authorized proves

---

[5]  The ABCMR cited the NGB advisory opinion which noted that the Plaintiff continued to work
after September 29, 1994 "in anticipation of renewed tour orders that never were issued.  [The
Plaintiff] state[d] he finally was told after a week or so that he was not selected for a new ADSW
tour."  (AR 76, 88.)

that he never received permission to continue his ADSW tour beyond the dates on his orders and serves as another indicator that the sanctuary provision was waived.

The ABCMR lawfully presumed administrative regularity and reasonably concluded that the Plaintiff waived the sanctuary provision on DA Form 1058 based on the orders, Army Reg. 135-200, and Plaintiff's own admissions. As a result, the Plaintiff has failed to prove that the ABCMR's decision was arbitrary, capricious, or contrary to law or regulation in the 2005 decision denying the Plaintiff's claim under the sanctuary provision.

**C. The Plaintiff Is Not Entitled To Constructive Service Credit For A Twenty Year Service Retirement When The ABCMR Concluded He Waived The Sanctuary Provision**

The 2005 ABCMR decision recognized that Plaintiff served over eighteen years when he began the ADSW tour on July 22, 1994, but concluded that he waived the sanctuary provision (AR 75-76). Therefore, Plaintiff is not entitled to a change of his records which would provide him with almost two years of constructive service credit to receive a twenty year service retirement.

Plaintiff claims that there were discrepancies in the Plaintiff's records as to his active federal service time, and accuses the ABCMR of improperly presuming that the Plaintiff had fewer than eighteen years of service. (Pl. Resp.15-16.) Plaintiff cites the July 29, 2005 NGB advisory opinion, a letter from the ABCMR on January 27, 2005, and the January 15, 1996 report of separation of record of service, which indicated he had less than eighteen years of service. (Id.) This information is irrelevant to Plaintiff's challenge to the September 22, 2005 ABCMR decision which stipulated that the Plaintiff had 18 years, 1 month, and 23 days of active duty when he entered his ADSW tour on July 22, 1994. (AR 75.) Accordingly, Plaintiff's allegation

is inaccurate; the ABCMR 2005 decision was based upon the most up to date, and accurate retirement history data available.  The ABCMR recognized that Plaintiff possessed over eighteen years of service, but since the Board concluded that he waived the sanctuary provision in 1994, he was not entitled to stay on active duty beyond the dates of his orders.  Therefore Plaintiff is not entitled to a twenty year active duty federal service retirement.

## II.  The ABCMR Correctly Determined The Plaintiff Is Not Entitled To Medical Disability Retirement When He Was Medically Fit Upon His Release From Active Duty

As stated in Defendant's motion for summary judgment, the ABCMR lawfully determined Plaintiff was not entitled to medical disability retirement because he demonstrated fitness for duty at the time of his release from active duty and there was no reason for referral to the Physical Disability System.  The ABCMR supported its conclusions with the substantial evidence of the Army doctor's medical diagnosis, the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) criteria for PTSD in 1994, the IG's report confirming the validity of the doctor's diagnosis, and Plaintiff's own admissions.  (Def. Mem. at 13-21.)  Plaintiff's response argues that the ABCMR should have articulated additional presumptions from the Physical Evaluation Board (PEB) regulation, and that PTSD began and was diagnosed during his 1994 ADSW tour, which, Plaintiff alleges, would entitle him to medical disability pay pursuant to 10 U.S.C. ¶ 1201.  (Pl. Resp. at 8-15.)  The ABCMR 2005 decision properly articulated the reasons supporting its decision to deny Plaintiff's request for medical disability retirement when he failed to meet his burden to prove he was medically unfit at the time of his release from active duty on September 29, 1994.  (AR 76-77.)

### A.  The ABCMR Applied The Proper Regulatory Presumptions

The ABCMR correctly applied the presumption that, in order to qualify for medical disability retirement, a service member must have a service-incurred, disabling condition which interferes with the ability to continue to adequately perform the duties of his or her office, grade, rank or rating period of time because of disability."  (AR 73; Army Reg. 635-40 ¶ 3-2b(1) (Def. Ex. E.)  The ABCMR correctly followed the regulation by applying the key criteria which is whether a service member can continue to reasonably perform military duties.  (AR 73-74, 76; Army Reg. 635-40 ¶ 3-1 (Def. Ex. E).)  The ABCMR found "no evidence to show the applicant was ever unfit to perform his duties while on active duty."  (AR 76.)  In supporting the denial for medical disability, the ABCMR stated that

> The [NGB] advisory opinion even noted that the applicant continued to work into early October [1994] and continued his medical appointments expecting that his ADSW tour orders [extension] would be forthcoming.  That is, he felt sufficiently fit, even though he was being treated for a medical condition, after he was properly released from active duty.  Therefore, the evidence shows there was no basis for referring him to the Physical Disability System.

(Id.)

Plaintiff claims that the ABCMR should also have articulated presumptions in Army Reg. 635-40, ¶3-2a, which apply to physical disability evaluations "before and during active service." (Pl. Resp. at 9; Army Reg. 635-40 ¶ 3-2 (Def. Ex. E).)  Plaintiff argues that it will be presumed that "[a]ny disease or injury discovered after a soldier entered active service, with the exception of congenital and hereditary conditions, was not due to the soldier's intentional misconduct or willful neglect and was incurred in line of duty."  (Id. at ¶ 3-2a(2).)  Also, sudden developments, "such as hemoptysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion, thrombosis, or cerebral hemorrhage" which occur "while the soldier is in military service will be regarded as service-incurred or service-aggravated."  (Id. at ¶ 3-2a(4).)  Plaintiff

10

claims the Board ignores these two presumptions which apply before and during active service, and must present substantial evidence to rebut these presumptions. (Pl. Resp. 9-10.)

The application of those two presumptions is unnecessary because it would not change the outcome for Plaintiff's non-eligibility for medical disability retirement from the Army. The ABCMR acknowledges Plaintiff was diagnosed with PTSD after his release from active duty, and thoroughly discusses that the Plaintiff "did not meet the DSM-IV criteria for diagnosis of PTSD while he was on active duty."[6] (AR 76.) Therefore, the ABCMR did comply with the presumptions in that the ABCMR noted that Plaintiff suffered symptoms that required him to seek help for grief therapy/crisis while on active duty, and that it can be presumed that those symptoms of depression due to his financial setback first occurred in the line of duty. (Id.) This presumption would not affect the ABCMR's conclusion because the Board determined Plaintiff's symptoms did not amount to PTSD according to the DSM-IV criteria, submitted by Plaintiff for consideration, and Plaintiff continued to work while being treated at WRAMC beyond his ADSW release date, indicating he was fit for service. (Id.) Simply having an injury or illness while on active duty does not equate to a disabling condition. See Heising v. Sec. of

---

[6] The ABCMR stated,

> [t]he diagnosis of the DVA physician will not be disputed; however, it is noted it appears he did not meet the DSM-IV criteria for diagnosis of PTSD while he was on active duty. The DSM-IV requires an extreme traumatic stressor, such as military combat, to trigger a response that involves intense fear, helplessness, or horror. It also requires more than one month of symptoms. He was first seen by military medical personnel on 19 September 1994 for grief therapy/crisis. It does not appear he made any mention of "intrusive thoughts and flashbacks and persistent nightmares and guilty feelings about war" that would have been symptomatic of PTSD until October or November 1994, after he was released from active duty.

(AR 76.)

Army, 554 F. Supp. 623, at n. 5 (D.D.C. 1982). Presuming Plaintiff incurred symptoms of depression due to financial distress in the line of duty would not qualify him for medical disability.

The ABCMR properly determined there was no basis for referring him to the Physical Disability System prior to his release from active duty on September 29, 1994. (AR 76.) The ABCMR fully addressed the relevant presumptions which govern whether or not Plaintiff would have been entitled to a medical discharge or medical disability at the time of his release from active duty on September 24, 1994. Therefore, the Board's 2005 decision was neither arbitrary, capricious, nor was it contrary to law or regulation.

### B. The Plaintiff's Assertion That His PTSD Condition Began During His 1994 ADSW Tour Requires Pure Speculation

#### 1. The Army Doctors at WRAMC Never Diagnosed Plaintiff With PTSD

Plaintiff claims that his PTSD manifested itself during his 1994 ADSW tour and incorrectly states that it was diagnosed during that ADSW tour. (Pl. Resp. 10.) Plaintiff accuses the 2005 Correction Board of "ignor[ing]" and "totally disregard[ing] the medical evidence that Wagner suffered from PTSD beginning in September 1994, when he was on active duty. (Pl. Resp. 17, 24.) Plaintiff relies on the October 19, 1994 notation by the Army doctor at WRAMC, but the doctor merely referred Plaintiff to the DVA for evaluation and continuing grief/crisis therapy. (Pl. Resp. 17; AR 639.) The Army doctor did not diagnose Plaintiff with PTSD prior to or after his release from active duty. (AR 297.)

There is no medical evidence that Plaintiff suffered PTSD prior to his release from active duty. At the beginning of September, he faced financial hardship and his unit tried to assist him by requesting his ADSW tour be extended 179 days, and that he receive a loan from the Army

Emergency Relief (AER) fund.  (AR 171-72.)  On September 19, 1994, ten days prior to his scheduled release from his ADSW tour, the Plaintiff sought mental health assistance at WRAMC to deal with the "frustration, despair, and anxiety regarding financial concerns/housing." (AR 68.)  The Army doctor continued to assist Plaintiff with four more appointments during the next few weeks.  (Id.)  However, the Army doctor never diagnosed him with PTSD.

Plaintiff was not diagnosed with PTSD  by the Department of Veterans Affairs (DVA) until after his release from active duty.  (Pl. Resp. Facts at 5-6.)  Plaintiff's response brief quotes the 2004 ABCMR opinion which noted that on October 21, 2004 "[after his separation from his Title 10 ADSW tour of duty] the DVA found the applicant suffered from PTSD." (Pl. Resp. 18.) The DVA's consultation on October 21, 1994 was the first time PTSD was mentioned in Plaintiff's records.[7]  Plaintiff's assertion that he was diagnosed with PTSD prior to his release from active duty is wrong. (See Pl. Resp. at 10.)

As explained in Defendant's motion for summary judgment, the ABCMR is not bound by the October 21, 2004 DVA's diagnosis of PTSD.  (Def. Mem. at 14-17.)  The Plaintiff's response attempts to discount the case authority cited to support the fact the ABCMR is not bound by the diagnosis or ratings of the DVA.  However, the case law is relevant because the only medical evidence of PTSD that the Plaintiff offers is that of the DVA.  Therefore, the case law is persuasive to show the ABCMR acted properly by considering the DVA's rating decisions.  The Board was not bound by the DVA's post-discharge ratings because the ABCMR

---

[7] The DVA conducted further evaluation of the Plaintiff and the DVA did not actually award him with disability benefits until August 29, 1995.  (AR 69.)  Even then, the DVA only granted the Plaintiff 50% disability, backdating the effective date to December 30, 1994, three months following the Plaintiff's release from active duty.  (Id.)  The DVA did not grant the Plaintiff 100% disability until October 20, 1995, a year after the VA first diagnosed him with symptoms of PTSD.  (Id.)

is charged with determining what disability rating would have been appropriate at the time of the

Plaintiff's release from his ADSW tour.  See Powell v. Marsh, 560 F. Supp. 636 (D.D.C. 1983);

see also Banerjee v. United States, 77 Fed. Cl. 522, 537 (Ct. Cl. 2007)(citing Hinkle v. United

States, 229 Ct. Cl. 801, 804-05 (1982)); Heisig, 554 F. Supp. at 628.

### 2.     ABCMR Logically Concluded The Plaintiff Did Not Qualify For Medical Disability For PTSD While On Active Duty When He Was Fit For Duty

Despite the lack of an actual diagnosis of PTSD prior to his release from active duty,

Plaintiff argues that the ABCMR was arbitrary and capricious because the Board did not

conclude that Plaintiff suffered from PTSD one month prior to the DVA's diagnosis, while the

Plaintiff was on active duty.  (Pl Resp. 18.)  Plaintiff's response brief asserts that it "defies logic

for boards to conclude that [the Plaintiff] did not suffer from PTSD one month before [October

21, 2004]."  (Id.)  Plaintiff's speculation as to Plaintiff's medical condition on September 21,

2004 does not meet the burden of proof required for medical disability to show Plaintiff was

unfit for service at the time of his discharge.

The ABCMR relied upon facts that indicate Plaintiff demonstrated he was fit just two

weeks prior to the DVA's diagnosis by continuing to work even after his release from active

duty.[8]  (AR 71, 76.)  The ABCMR explained that,

> To be determined to be unfit the unfitness must be of such a degree that the
> Soldier is unable to perform his duties in such a way as to reasonably fulfill the
> purposes of his employment on active duty.  There is no evidence to show the
> applicant was ever unfit to perform his duties while on active duty.  The advisory

---

[8]  That fact the Plaintiff continued to work clearly indicates the Plaintiff was medically fit on
September 29, 1994.  "[C]ontinued performance of assigned duty commensurate with his or her
rank or grade . . . is . . . a presumption that the soldier is fit."  Army Reg. 635-20 ¶3-2b(2)(Def.
Ex. E).

opinion even noted the applicant continued to work into early October [1994] and continued his medical appointments expecting that his ADSW tour orders [extension] would be forthcoming. That is, he felt sufficiently fit, even though he was being treated for a medical condition, after he was properly released from active duty. Therefore, the evidence shows there was no basis for referring him to the Physical Disability System.

(AR 76.)

This Court has also recognized that, "a member is presumed to be fit for duty if he has continued to perform his duties . . . ." Heising, 554 F. Supp. At 625 (citing Army Reg. 635-40 § 2-2(b)(1)). The burden is on the member seeking medical retirement to prove by a preponderance of the evidence that he is unfit for duty. Id. (citing Army Reg. 635-40 § 2-2b(4)). The Plaintiff did not submit any evidence to the ABCMR to demonstrate that he was unfit for duty at the time he was released from active duty on September 29, 1994.

The ABCMR's 2005 decision carefully analyzed the DSM-IV evidence submitted by Plaintiff and found that Plaintiff did not meet criteria for PTSD when he was on active duty in 1994. (AR 73-74, 76.) The ABCMR's explanation of the DSM-IV set out clear definitions of "Phase of Life Problem" diagnosis, PTSD, Acute Stress Disorder, and Generalized Anxiety Disorder. (AR 73-74). These definitions do not require the expert advice of a psychiatrist as the Plaintiff suggests. (Pl. Resp. 20-21.) The ABCMR applied these straight forward definitions to the Army doctor's diagnosis on December 20, 1994. (AR 76.) The ABCMR explained that "DSM-IV [diagnosis for PTSD] requires an extreme traumatic stressor, such as military combat, to trigger a response that involves intense fear, helplessness, or horror. It also requires more than one month of symptoms." (Id.) The ABCMR noted that it did not appear that Plaintiff "made any mention of '… intrusive thoughts and flashbacks and persistent nightmares and guilty feelings about war' that would have been symptomatic of PTSD until October or November

1994, after he was released from active duty." (Id.) Therefore, the ABCMR reasonably concluded that Plaintiff did not exhibit the DSM-IV criteria for PTSD at the time of his release from active duty.

As a result, the ABCMR logically concluded that, as of his release date from active duty, there was no reason that the Army would have submitted Plaintiff for a physical disability evaluation or for a medical discharge review board. Plaintiff accused the Board of being arbitrary and capricious for not backdating the PTSD date to the ADSW tour based on the DVA's determinations, but as this Court stated, "[i]t is well established that a [D]VA determination of extent of disability at some post-discharge date, is not binding upon the ABCMR for purposes of arriving at the correct figure for disability retirement." Heisig, 554 F. Supp. at 628. Therefore, the ABCMR's 2005 decision denying Plaintiff medical disability retirement based on evidence he was fit for duty at the time of his release was not arbitrary, capricious, or contrary to law or regulation.

C. **The ABCMR Conclusion That Plaintiff Did Not Incur PTSD During His 1994 ADSW Tour Precludes Entitlement To Medical Disability Under 10 U.S.C. § 1201 (2008)**

Plaintiff argues that he should be entitled to medical disability based on 10 U.S.C. § 1201 (2008) because he incurred PTSD during the course of his ADSW tour. Because the ABCMR concluded the PTSD did not incur during his ADSW tour, the statute is not applicable to Plaintiff's claim.

III. **The ABCMR Found Substantial Evidence Supported The Army Doctor's 1994 "Phase of Life Problem" Diagnosis**

Plaintiff also argues that the ABCMR was arbitrary and capricious because the Board took the wrong approach by discussing the DSM-IV definitions of "phase of life" problem,

16

PTSD, and acute distress disorder.  (Pl. Resp. 20.)  Plaintiff also claims the ABCMR's refusal to change Plaintiff's medical diagnosis was not supported by substantial evidence because the DVA medical records controvert the Board's findings.  (Pl. Resp. 19-21.)  The standard is not whether Plaintiff thinks the ABCMR took the correct approach to address the claim or believes the Board should have made assumptions based on DVA medical records.  See Roberts v. Geren, 530 F. Supp. 2d 24, 34 (D.D.C. 2004)(holding that the Board is entitled to weigh evidence to determine that Plaintiff had not demonstrated probable error or injustice, and the court may not substitute its own judgment where an agency's decision has a rational basis).  Rather, "if the record contains such evidence that a reasonable mind might accept as adequate to support a conclusion, the court must accept the Board's findings."  Smith v. Dalton, 927 F. Supp. 1, 5 (D.D.C. 1996).

A.    **The ABCMR Appropriately Cited Substantial Evidence To Support The "Phase of Life" Diagnosis**

The ABCMR analyzed the Army doctor's December 1994 "Phase of Life" diagnosis and the DSM-IV criteria, as submitted by Plaintiff for review, related to phase of life problems, symptoms, and treatments.  (AR 67.)  The Board determined that "[t]he DSM-IV describes 'Phase of Life Problem' as a category that can be used when the focus of clinical attention is a problem associated with a particular developmental phase or some other life circumstance that is not due to a mental disorder.  Examples include problems associated with starting a new career and changes involved in marriage, divorce, and retirement."  (AR 77.)  The ABCMR then concluded the Plaintiff's problem at the time of his discharge "was not due to a mental disorder." (Id.)  The ABCMR pointed out that the Plaintiff "acknowledge[d] it was due to a financial problem with the IRS and then to DFAS's response to the IRS levy (and failure to respond to the release from levy) when he began his ADSW tour (analogous to a new career)."  (Id.)  As a

result of the DSM-IV analysis and the Plaintiff's own admissions, the ABCMR concluded the doctor's determination that the Plaintiff had a "phase of life problem" at the time of his release from active duty was correct.  (Id.)

The ABCMR has noted that other agencies also determined that Plaintiff did not suffer from PTSD at the time of his release from active duty.  The ABCMR cited that the Office of the Surgeon and the Judge Advocate at the NGB found there was no support for PTSD, and stated that all of the "evidence at the time pertained to an elevated anxiety due to a personal monetary problem about the time [Plaintiff] was ordered to active duty."  (AR 70.)  The ABCMR also noted that when the Inspector General (IG) inquired into the Plaintiff's medical care, the Chief of Outpatient Psychiatry Services at WRAMC determined Plaintiff's medical information was correct.  (AR 165.)

Plaintiff's disagreement with the ABCMR's approach or conclusion does not equate to the Board being arbitrary or capricious.  Plaintiff failed to demonstrate the Board's analysis was not supported by substantial evidence.  The ABCMR clearly explained how the Board determined there was no error with the 1994 December diagnosis that the Plaintiff experienced a "Phase of Life" problem.

**B.     Plaintiff Inaccurately Claims Medical Evidence Contradicted "The Phase Of Life" Diagnosis**

Plaintiff claims that the Army's December 1994 diagnosis that the Plaintiff suffered from a "Phase of Life" problem conflicted with that of the Walter Reed outpatient clinic consultation sheet dated October 19, 1994.  (Pl. Resp. 19; AR 639.)  However, the December 1994 "Phase of Life" diagnosis for the line of duty investigation is consistent with the October 19, 1994 Army doctor's symptoms of "2 mo. frustration, despair and anxiety because of financial and housing

18

crisis" listed at the top of the consultation sheet.[9]  (Pl. Resp. 19; AR 639.)  The Army doctors'

information did not conflict.  Both the symptoms listed by the Army doctor on October 19, 1994

and the December 1994 diagnosis met the DSM-IV criteria for a "Phase of Life" problem.  (AR

77.)

Plaintiff also alleges the Army doctor's "Phase of Life" diagnosis was incorrect because

a DVA medical progress note on December 5, 1994 stated that the Army doctor "suggested"

hospitalization while he was serving his ADSW tour.  (Pl. Resp. 20.)  The DVA medical note

actually stated that Plaintiff was "offered" hospitalization at WRAMC on September 3, 1994, but

he refused.  (AR 634.)  Plaintiff's claim that this entry referencing hospitalization proves that the

diagnosis was incorrect, yet it is common knowledge people are often hospitalized for depression

which does not equate to PTSD.  Therefore, the Plaintiff's reliance on the DVA's medical

doctor's note is misplaced.  The Plaintiff was not hospitalized and continued to work through the

month of September which again confirms the Plaintiff did not experience a disabling condition

to warrant medical disability and indicates the ABCMR correctly concluded that "Phase of Life"

diagnosis was appropriate.

**IV.    The 2005 Board's Refusal to Change the LOD Determinations Was Neither Arbitrary, Capricious, Nor Contrary To Law Or Regulation**

As explained in Defendant's motion for summary judgment, the 2005 ABCMR Board

determined that Plaintiff submitted insufficient evidence to  warrant changing the LOD

determinations.  (Def. Mem. 23-26; AR 68, 70-71, 73-74, 76-78.)  Plaintiff selectively relies on

the NGB advisory opinion and the investigating officer's findings which recommend a finding of

---

[9]  The bottom of the consultation sheet, completed by the <u>DVA</u> doctor on October 21, 1994, diagnosed Plaintiff with PTSD.  (AR 639.)

in the line of duty (AR 21-24), but fails to meet the burden to show that the ABCMR's decision was arbitrary, capricious, or contrary to law or regulation.

The Plaintiff again argues that the Board "totally disregarded medical evidence that Mr. Wagner suffered from PTSD beginning in September 1994." (Pl. Resp 24.) Yet, Plaintiff's response brief also admits the Board reviewed all the evidence. (Id.) As established above, there is no evidence that the Plaintiff suffered from PTSD at the beginning of September 1994 or while he was on active duty during his 1994 ADSW tour. The ABCMR considered Plaintiff's DVA's medical records which establish that the DVA diagnosed and treated Plaintiff for PTSD after he was released from active duty. (AR 76.) Again, the ABCMR is not bound by a post-release date diagnosis when deciding whether or not Plaintiff incurred the condition in the line of duty before September 29, 1994. See Powell v. Marsh, 560 F. Supp. 636 (D.D.C. 1983); see also Banerjee v. United States, 77 Fed. Cl. 522, 537 (Ct. Cl. 2007)(citing Hinkle v. United States, 229 Ct. Cl. 801, 804-05 (1982)); Heisig, 554 F. Supp. at 628.

The ABCMR refused to change the 1995 LOD recommendation after they found that Plaintiff was fit for duty upon his release from active duty in 1994, and the "Phase of Life" diagnosis was appropriate. (AR 76-77.) As the ABCMR explained in a letter to Plaintiff , "a LOD finding has no bearing on whether referral to the Physical Disability System is required." (Id.) Accordingly, the ABCMR determined a correction to the LOD was not warranted when any change to the 1995 LOD determination would not provide any effective relief for the Plaintiff. (Id.)

The ABCMR agreed with the NGB's advisory opinion that the appointing authority for the 1995 LOD investigation should have been conducted by the NGB or Headquarters Company

at Fort Myer, rather than the DCARNG, since Plaintiff was in a title 10 status during the ADSW

tour.  (AR 68-69, 71.)  The Board stated that its refusal to change the LOD did not prevent

Plaintiff from exhausting his administrative remedies and "appealing the findings of the LOD

based upon it being conducted by a command not authorized to do so."  (AR 77.)

      Plaintiff disputes the January 1995 LOD investigation because it mentioned that

Plaintiff's "emotional concerns precipitated by financial problems which started on the 1st of

July, prior to the start of active duty."  (Pl. Resp. 21-22.)  Plaintiff seems to suggest that fact is

not relevant because the Plaintiff's "mental breakdown began when the Army financial service

deducted the IRS levy amount in August 1994."  (Pl. Resp. 21.)  However, Plaintiff cannot deny

that the IRS placed the levy on his wages and other income prior to his ADSW tour which

indicates that he may have faced financial difficulties prior to entering active duty.  The ABCMR

reasoned that '[h]ad the IRS not placed a levy against [Plaintiff] prior to his entry on the ADSW

tour in the first place, DFAS could not have exacerbated the problem."  (AR 77.)  The ABCMR

concluded that the entry on the 1994 LOD which stated "'Emotional concerns were precipitated

by financial problems which started the first of July 1994, prior to the start of active duty

service,' appear[] to be accurate . . . ."  (AR 77.)

      The NGB legal review of the 2005 LOD investigation stated that Plaintiff reported to

doctors that "he had been confronting financial and mental problems since 1 Jul 94," prior to his

ADSW tour  (AR 105.)  The legal review indicated this fact was critical in the 2005 LOD

determination.  (AR 105-06.)  The opinion stated that even though

> there is a presumption that a soldier's injury, disease, or death occurs in the line
> of duty, this presumption may be refuted by substantial evidence and by a greater
> weight of evidence that supports any different conclusion.  The Department of the
> Defense directed in reference 1d [Conditions Presumed to be Pre-Existing], that

the occurrence of disease as of signs or symptoms of chronic disease identified so soon after the day of entry on Military Service (usually within 180 days) shall be presumed to have existed prior to entry into Military Service.  Based on the evidence in the file that substantiates a preexisting mental condition and that SGM Wagner did not provide documentation of his medical condition during his active duty service, I recommend the determination of Not in Line of Duty-Not due to Own misconduct-EPTS-No Aggravation be approved.

Therefore, the reference to Plaintiff's condition beginning prior to his ADSW tour is noteworthy.

Plaintiff argues that the ABCMR should have changed the April 2005 LOD investigation based on the investigating officer's findings, rather than upholding the appointing authority, Office of Surgeon, and the NGB's Judge Advocate determination that Plaintiff did not incur PTSD in the LOD.  Plaintiff relies on the NGB's advisory opinion and the DVA's medical records to support his position.  Plaintiff's disagreement with the ABCMR's conclusion does not deem the ABCMR's decision arbitrary and capricious.

The ABCMR carefully reviewed all of the evidence regarding the two line of duty investigations, the NGB's advisory opinion, in addition to the medical records Plaintiff submitted from the Army and DVA.  The 2005 Board provided a rational connection between the facts found and its conclusions for denying Plaintiff's request to change the LOD determinations.  Therefore, the ABCMR's 2005 decision regarding the LOD determinations was not arbitrary, capricious, or contrary to law or regulation.

**V.  Remand To The ABCMR For A Tenth Time Is Not Necessary In This Case**

The 2005 Board carefully reviewed all of the evidence regarding the Plaintiff's claims and issued a fifteen page opinion outlining the facts found, the reasons for its decision, and orders to grant partial relief where they deemed appropriate.  The Plaintiff insists the ABCMR

reconsider the Plaintiff's claims for a tenth time, however, provides no valid reason that would justify a remand in this case.

Remand would be inappropriate in this case because (1) the Board considered all of the evidence and arguments raised by the Plaintiff; (2) the ABCMR's 2005 decision satisfactorily articulated the reasons for denying each of the Plaintiff's claims; and (3) the Plaintiff has not submitted any new evidence for the Board to consider. See Roberts v. Geren, 530 F. Supp. 2d 24, 34 (D.D.C. 2007)(holding this Court "will not disturb the decision of an agency that has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. If the record contains such evidence that a reasonable mind might accept as adequate to support a conclusion, the court must accept the Board's findings.); Lassalle v. Geren, Civ. No. 06-1481, 2007 U.S. Dist. LEXIS 31056, (D.D.C. Apr. 27, 2007)(remanding only when request for reconsideration contains new evidence); Roberts v. Harvey, 411 F. Supp.2d 111, 121-22 (D.D.C. 2006)(holding remand proper if Board fails to consider potentially meritorious argument raised by Plaintiff). "There is [ ] no reason to remand the matter as the outcome is clear." Lasalle, 2007 U.S. Dist. LEXIS 31056, at *17-18; See Federal Election Comm'n v. Legi-Tech, Inc., 75 F.3d 704, 708-09 (D.C. Cir. 1996)(affirming the principle that "remand to the agency is unnecessary formality where the outcome is clear"); A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1489 (D.C. Cir. 1995)(court need not remand "where '[t]here is not the slightest uncertainty as to the outcome of a[n] [agency] proceeding.'").

The Plaintiff asks this Court to remand the case based on accusations that the ABCMR violated the APA by concluding the Plaintiff waived the sanctuary provision. The Plaintiff

misplaces the focus on the actual production of the Plaintiff's waiver of the sanctuary provision, (Pl. Resp. 4-5.) when the real issue is whether the ABCMR's decision was reasonable when that document is not available. While parties could speculate as to why that fourteen year old application for his ADSW tour is not located in the Plaintiff's military records, the Board lawfully presumed administrative regularity in accordance with the ABCMR regulation to conclude the Plaintiff waived the sanctuary provision. (AR 75-76.) The ABCMR provided other reasons such as the dates clearly printed on the Plaintiff's orders, and the lack of approval from the Director of the Army National Guard for an exception to the 180 day limit on ADSW tours, or the 60-day break rule as additional evidence that the Plaintiff consented to a tour of limited duration, from July 29 to September 29, 1994. (Id.) The ABCMR provided a complete explanation how the Board concluded that the Plaintiff was not involuntarily released from active duty, and waived the sanctuary provision. (Id.) Although the Plaintiff disagrees with the ABCMR's findings and conclusion, the Board thoroughly examined the facts and regulations to rationally reach its conclusion. Plaintiff also accuses the Board of ignoring the DVA's medical evidence that the Plaintiff suffered from PTSD after his release from active duty, however, the Plaintiff admitted the ABCMR considered all of the evidence. (Pl. Resp. 24.)

All of the ABCMR's determinations were thoroughly explained and rationally justified, therefore remand is not necessary in this case. None of the ABCMR's decisions in this case were arbitrary, capricious, contrary to law or regulation.

## CONCLUSION

For the foregoing reasons, the Defendant respectfully requests that this Court enter judgment in favor of the Defendant denying Plaintiff's claims.

Respectfully submitted,


_____/s_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s_____
LANNY ACOSTA, JR.
Special Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
202-353-9895


Of Counsel:
Major Kelly McGovern
U.S. Army Litigation Division