## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GEORGE W. WAGNER, JR.** | |
| **Plaintiff** | **Case No. 1:08–cv-0213-RMU** |
| v. | |
| **PETE GEREN**<br>**SECRETARY OF THE ARMY** | **August 18, 2008** |
| **Defendant** | |

### PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION
### TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff George W. Wagner, Jr., respectfully submits this Reply to Defendant's Opposition to his Cross-Motion for Summary Judgment. The 2005 decision of the Army Board for Correction of Military Records (Board) was arbitrary, capricious or contrary to law or regulation. Among his other arguments, Mr. Wagner points out that Fed. R. Evid. 1002 and 1004 ("the Best Evidence Rule") preclude admission of the contents of DA Form 1058-R to prove that Mr. Wagner signed the waiver of sanctuary provision.

### I. ARGUMENT.

#### A. The Board's Conclusion that Mr. Wagner Waived Sanctuary Was Arbitrary, Capricious or Contrary to Law or Regulation.

#### 1. Federal Rules of Evidence 1002 and 1004 Preclude Reliance on a Blank DA Form 1058-R to Prove that Mr. Wagner Signed the Waiver of Sanctuary.

Defendant acknowledges that:

> [t]he crux of Plaintiff's argument for retirement benefits rests upon whether the ABCMR reasonably concluded that Plaintiff waived

the sanctuary provision when the Department of the Army (DA)
Form 1058-R is not available in Plaintiff's records.

(Defendant's Reply and Opp. at 2).

In place of the original form 1058-R, which Defendant claims Mr. Wager allegedly signed fourteen years ago, Defendant offers a blank form, stating in support that the latter contains the same preprinted paragraph waiving the sanctuary provision. (AR at 97-98).

Defendant attempts to negate Mr. Wagner's argument that the Army must provide a signed copy of the form, calling this argument "misguided." (Defendant's Reply and Opp. at 2-3). However, there is nothing "misguided" about requiring the party claiming there was a signature to prove this assertion with the very paper that contains the signature.

Defendant bases its entire argument for accepting the blank form as proof of Mr. Wagner's having signed and assented to waiver of sanctuary on administrative regularity. Such regularity, argues Defendant, demonstrates that the "Board members reached a reasonable conclusion based on the evidence that was available." Id. at 3. Thus, Defendant asks this Court to sanction reliance on a blank form for proof of the contents of that form, i.e., Mr. Wagner's signature.

The blank form, however, is inadmissible under Fed R. Evid. 1002 and 1004, commonly called the "Best Evidence Rule." Rule 1002 states, in relevant part:

> To prove the content of a writing ... , the original writing ... is
> required, except as otherwise provided in these rules or by Act of
> Congress.

Rule 1003 provides that a duplicate of the original is admissible to the same extent as the original, except if there is a genuine question to the original's authenticity or admission of the duplicate would be unfair.

In this case, the Board did not have either the original or the duplicate of Form 1058-R with Mr. Wagner's signature it when considered whether Mr. Wagner waived his sanctuary right.

Rule 1004 permits use of "other evidence" of the contents of a writing in one of four instances. The category that applies to this case is "(1) Originals Lost or Destroyed." However, not just any evidence is permissible, as U.S. v. Bennett, 363 F.3d 947 (9th Cir. 2004), establishes.

In Bennett, the defendant was convicted of possession and illegal importation of marijuana. On appeal, the court reversed the importation conviction based on the best evidence rule under Rules 1002 and 1004. Id. at 949 and 953-54.

The government alleged that the Bennett defendant had transported the marijuana in his boat from Mexican to United States waters. To prove this charge, the government relied upon a witness who testified that during a search of the boat, he had seen a GPS (global positioning system) device with a backtrack feature that charted the defendant's journey from Mexico to San Diego. This witness also testified that the GPS had "way points," programmed the previous year, that included points in Mexican waters. The witness, however, admitted on cross-examination that he had not taken possession of the GPS or made any record of the data the GPS contained. Id. at 952. Thus, the only evidence of the GPS charting was the witness' testimony.

The trial court overruled the defendant's best evidence rule objection to this testimony. Id. The appeals court disagreed.

The Bennett court explained that:

> The best evidence rule provides that the original of a "writing ..." is
> required to prove the contents thereof. ... An original is the writing
> ... itself ...."

> Where the rule applies, the proponent must produce the original (or a duplicate ...) or explain its absence. The rule's application turns on "whether contents are sought to be proved." ... However, the rule does apply when a witness seeks to testify about the contents of a writing ... without producing the physical item itself — particularly when the witness was not privy to the events those contents describe.

Id. at 953.

The court in Bennett found that the witness' testimony violated the best evidence rule because, among other factors, the witness never "actually observed" the defendant's boat travel from Mexico to the United States. The witness' testimony, said the court, "concerned the 'content' of the GPS, which, in turn, was evidence" of the defendant's travels. Id. The court also pointed out that he did not witness the defendant enter the way points into the machine. Id. at fn. 5.

Bennett pointed out that the GPS itself or a print-out from the GPS would have been the best evidence of the defendant's travels. Id. at 954.

This case falls squarely within Bennett. In this case, the Board did not even have witness testimony or written statement about seeing the original or duplicate of the Form 1058-R signed by Mr. Wagner. Nor did any witness testify or provide a written statement that he or she witnessed Mr. Wagner sign the form, in particular the waiver of sanctuary provision. The only "evidence" that Mr. Wagner signed the waiver was the blank Form 1058-R.

The Defendant has not offered any evidence that it lost, destroyed or otherwise could not obtain the original, allegedly signed form, as Rule 1004 requires. The Defendant has never, in all this paperwork, described any effort to find the original or a duplicate.

The blank Form 1058-R cannot constitute "other evidence" under Rule 1004 because it shows nothing about whether or not Mr. Wagner ever signed that particular form and waived his sanctuary. Indeed, there is only the Board's word that the blank Form 1058-R in the record (AR at 97-98) is the same as one Mr. Wagner arguably would have signed in July 1994 — 14 years ago.

The Defendant's argument of presumed administrative regularity cannot overcome the absence of a the form necessary to prove the contents of that form — the presence of Mr. Wagner's signature. Defendant argues that the Board "appropriately relied on facts from Plaintiff's 1994 ADSW tour orders and the relevant regulations" to conclude that Mr. Wagner waived sanctuary. (Defendant's Reply and Opp. At 3). The tour orders and regulations do not, however, substitute for the form showing Mr. Wagner's signature.

The Board made a clear error of judgment. The authorities that Defendant relies upon, <u>Pierce v. Underwood</u>, 487 U.S. 552 (1988), and <u>Burlington Northern R. Co. V. Surface Transp. Bd.</u>, 115 F.3d 206 (D.C. Cir. 1997), do not support his case.

Defendant asserts that Mr. Wagner, to prove that he did not waive sanctuary, should have produced "a copy of order extending his ADSW tour by twenty months until his retirement, or evidence that the Director of the National Guard waived the 180-day limit on his ADSW tour and granted an exception to the 60-day break rule." (Defendant's Reply and Opp. at 3-4). However, these two pieces of "evidence" do not prove the presence or absence of a signature. There is nothing in the record establishing that the decision makers on these two matters considered whether or not Mr. Wagner waived sanctuary.

The Board's reliance on the blank Form 1058-R to conclude that Mr. Wagner waived

sanctuary was arbitrary and capricious and contrary to law and regulation.

### 2. The Additional Facts from Mr. Wagner's Orders and Regulatory Provisions Do Not Indicate that Mr. Wagner Waived Sanctuary.

Defendant argues that the Board's reliance on regulatory requirements and information on

Mr. Wagner's orders support the conclusion that Mr. Wagner waived sanctuary. Army

Regulation 135-200, claims Defendant, establishes that Mr. Wagner could not have continued his

tour past September 29 1994, and could not have started another ADSW tour until November 29,

1994.[1]  Id. at 5.

Defendant then explains the "practical considerations for the 180-day and 60-day limits"

on ADSW tours. The 180 days avoided "having to count those Soldiers on active duty over 180

days as being part of the Army National Guard Active Guard Reserve (ARNG AGR) end

strength."  Id.  The 60 days prevented the appearance of permanent tours.  Id.

Given these considerations, Defendant argues, the Board could reasonably determine that

Mr. Wagner waived sanctuary.  Id.

However, these regulatory objectives do not prove whether or not Mr. Wagner actually

signed and agreed to the sanctuary waiver. The question is whether the signature appears on the

---

[1]  AR 135-200 states:

> ... if being considered for an ADSW tour in the first 2 months of a fiscal years, the solider must have had a minimum break of 60 continuous calendar days following the last day of an ADSW tour in the previous fiscal year.  The break was only required if the Solider had accumulated over 30 days of ADSW in the last quarter of the previous fiscal year.

Form 1058-R in question.  Without the actual form, there is no proof.  A regulatory scheme cannot substitute for the actual writing.

Moreover, Mr. Wagner was not in danger of going over the 180-day limit on his ADSW tour.  As the 29 July 2005 Advisory Opinion pointed out:

> b.  Because the SGM [Wagner] would have had far fewer than 179 days on 20 Sep 94, there was no point in curtailing his initial period and re-ordering him after 1 Oct 94 and risking the potential for added delays as were encountered in the first order.

(AR at 90, ¶ 5a.).

Defendant contests Mr. Wagner's claim that the ADSW tour orders were hastily prepared.  Id. at 6.  Defendant claims that Mr. Wagner stated "that the Army actually took over a month to approve the orders," citing paragraph 7 of Mr. Wagner's "Statement of Material Facts to which There Is No Genuine Dispute."  Id.  This paragraph states:

> 1.    The Army originally asked Mr. Wagner if he would be available in June 1994, but the orders were late in getting approved.  (AR at 88).

Defendant misinterprets this statement.  Mr. Wagner is not saying that the Army worked for a month on his orders.  Rather, the Army delayed preparing the orders and did so at the last minute.  This was the conclusion that the 29 July 2005 Advisory Opinion reached.  (AR at 87-88, ¶¶ 4.a (1)-(2)).  As the Advisory Opinion explained:

> a.  It appears that Orders 100-021 were hastily prepared.  The SGM [Wagner] was ordered to report to the ARNGRC (Army National Guard Readiness Center) Arlington, VA on 22 July 2004.  Because the orders were issued late, they were verbally confirmed by the Adjutant General, DC.

Id. at 87, ¶ a.

The hasty preparation of the orders, resulting in a verbal confirmation, explains how the Army could have missed Mr. Wagner's not signing and agreeing to the sanctuary waiver.

Defendant also attempts to minimize the orders containing the wrong activation authority, Title 32 instead of Title 10.  Defendant attempts to explain away the wrong authorization as a "typographical error."  (Defendant's Reply and Opp. at 6).  However, Defendant does not cite to the Board's opinion for this characterization.  Rather, it appears that this is Defendant's own term to avoid what is an administrative irregularity.  The entry on the orders at the line "Auth:" is too long to be a typographical error, stating:

Title 32 USC 502(f)  Confirms verbal orders of the Adjutant

(AR at 10).

Defendant then cites to the orders' instruction about the beginning and end dates of the tour and where Mr. Wagner was to report.  This information, claims Defendant, shows the self-terminating nature of the orders and that Mr. Wagner would be automatically removed on 29 September 1994, unless competent authority extended the tour.  Id. at 7.

Again, these factors do not establish that Mr. Wagner signed the sanctuary waiver on Form 1058-R.  They are considerations outside the document and cannot prove the document's actual contents.

Defendant claims that Mr. Wagner acknowledged that his ADSW tour was of "limited duration" because he "expressed hopes of obtaining an extension once he began the project," citing the record at AR at 71, 76, and 88.  However, only AR at 88 ¶ 3 makes any mention of Mr. Wagner's "hopes" of the tour's being extended and this comment was in the context of enabling the project to be finished.

-8-

(3) The sergeant major was chosen to prepare a National Guard Pamphlet on Stock Fund Depot Level Repairables. He stated that he was originally asked to be available in June but the orders were late in getting approved, and that the work would very likely extend into the new fiscal years. ... The SGM continued to work after 29 Sep 94 in anticipation of renewed tour orders that never were issued. He state he finally was told after a week or so that he was not selected for a new ADSW tour. An NGB draft Executive Summary with hand-written notes, dated 28 Sep 94, on the efforts of the SGM and CW3 Lentz (they worked together on the project) and apparently written by the SGM, implies in the hand-written notes that someone expected the effort to continue beyond the current period of ADSW.

The flaw in Defendant's analysis is that the self-terminating ADSW tour, Mr. Wagner's knowledge of the tours dates and his expressing hopes that the Army would extend the tour have nothing to do with whether Mr. Wagner waived sanctuary in terms of his total military career. The two situations are, as the weathered comparison goes, apples and oranges. Even if the Army extended the ADSW tour, there is no evidence in the record that the tour would have continued until Mr. Wagner had reached his 20-year retirement point. Rather, the quotation above merely demonstrates that Mr. Wagner considered an extension likely in that he could not start the project until July 1994, rather than June, and therefore the project would take longer to finish than by 29 September 1994. Mr. Wagner's continuing to work on the project showed Mr. Wagner's dedication to his work, despite the PTSD that he was suffering from.

None of the above collateral evidence proves whether there is a 1994 Form 1058-R which contains Mr. Wagner's signature waiving sanctuary. The Army's reliance on this collateral and outside evidence to deny, in 2005, Mr. Wagner's claim of sanctuary was arbitrary, capricious or contrary to law or regulation.

**3.  Defendant's Conclusion that Mr. Wagner Is Not Entitled
to a 20-Year Service Retirement Fails because Defendant Bases
This Determination on the Assumption that Mr. Wagner Waived Sanctuary.**

Defendant rests his conclusion that Mr. Wagner is not entitled to his 20-year service

retirement based only on Mr. Wagner's waiving sanctuary.  (Defendant's Reply and Opp. at 7-8).

As Mr. Wagner has argued above and in his initial memorandum, the Board's finding such a

waiver is arbitrary, capricious or contrary to law and regulation.

Defendant argues that the 2005 Board acknowledgment of  Mr. Wagner's service of 18

years, one month and 23 days of active duty when Mr. Wagner entered the ADSW tour on 22

July 1994 corrected the previous discrepancies in his service records.  Id.  This argument is

flawed.  The crucial question is, why would a service member with this amount of active service

waive sanctuary?  To answer that he would is arbitrary, capricious or contrary to law or

regulation.

**B.  The Board's Determination that Mr. Wagner Is Not Entitled
to Medical Disability Retirement Was Incorrect.**

The Board concluded that Mr. Wagner did not qualify for a medical disability retirement

because it claims that Mr. Wagner demonstrated fitness for duty at the time the Army released

him from active duty and there was no reason to refer him to the Physical Disability System.  Id.

Mr. Wagner has extensively discussed in his initial memorandum why the Board's determination

that he was fit at the time of his discharge was unreasonable.  As Mr. Wagner explained, he was

entitled to medical disability retirement based on:  (1) 10 U.S.C. § 1201 (2008), "Regulars and

members on active duty for more than 30 days: retirement"; (2) Army Regulation 635-40,

"Physical Evaluation for Retention, Retirement or Separation" (August 15, 1990); and (3) the

fact that Mr. Wagner incurred his PTSD during his ADSW tour.  (Wagner Mem. at 8).

**1.  The Board Could Not Reasonably Conclude that
Mr. Wagner Was "Fit for Duty" Simply because He
Continued Reporting for Work.[2]**

Defendant justifies the Board decision that Mr. Wagner was fit for duty at the time of his

discharge because the Board applied the presumption that:

> ... in order to qualify for medical disability retirement, a service
> member must have a service-incurred, disabling condition which
> interferes with the ability to continue to adequately perform the
> duties of his or her office, grade, rank or rating period of time
> because of disability."

(Defendant's Reply and Opp. at 10).  Defendant states that there was no evidence to show that

Mr. Wagner could not perform his duties and cites the Board's citing the Advisory Opinion's

noting that Mr. Wagner continued working into October 1994.  Id.

However, the Board's citation to the Advisory Opinion on this point does not

acknowledge the full extent of the Advisory Opinion's conclusion about Mr. Wagner's supposed

fitness for duty.  The Advisory Opinion concluded that:

> g.  The SGM sought psychiatric care at WRAMC five times from
> 19 Sep 94 through 2 Oct 94 according to the WRAMC IG.[3]

***

---

[2]  This argument also addresses Defendant's discussion about Mr. Wagner's alleged fitness for
duty in Defendant's subsection:

**2.  ABCMR Logically Concluded The Plaintiff Did Not Qualify For Medical
Disability For PTSD While On Active Duty When He Was Fit For Duty**

See Defendant's Reply and Opp. at 14-15.  Emphasis in Defendant's original.

[3]  The Advisory Opinion contains a typographical error, "19 Sep 04."  The only correct year
could be "94."

I. The SGM continued to work into early October, and continued his Walter Reed appointments expecting that his ADSW tour orders were forthcoming.

j. An officer at NGB notified the SGM that he was not selected for a new (actually a follow-on) ADSW tour to complete the project. It would be reasonable to assume that the SGM's financial problems and repeated absence to seek medical care could have influenced that decision. In practice, that would have been the officer working the project telling the SGM in person or calling the SGM by telephone to inform him of the decision.

k. In mid-October 1994, WRAMC referred the SGM to the VA system for his continued care and he was admitted to the Washington, D.C. Veterans Administration Hospital.

(AR at 91, ¶¶ g, I-k).

Given the above conclusions, it was not reasonable for the Board to find that Mr. Wagner was fit for duty. As the Advisory Opinion noted, Mr. Wagner missed work because of his numerous visits to Walter Reed for psychiatric care for the PTSD from which he suffered. The Board ignores Mr. Wagner's absences from work for the psychiatric treatment and the interference with his work that resulted. The Board also ignored the Advisory Opinion's determination that these medical absences influenced the decision not to grant Mr. Wagner a follow-on ADSW tour.

### 2. Defendant's Analysis of Why the Board Did Not Need to Consider Army Reg. 635-40, concerning Presumptions Applying to Physical Disability Evaluation, Is Wrong.

Defendants argue that the Board did not need to apply and consider Army Reg. 635-40, ¶ 3-2 Presumptions, which states that: "The following presumptions will apply to physical disability evaluation." (Def. Ex. E). The relevant paragraphs state:

a. *Before and during active service.*

***

(2) Any disease or injury discovered after a soldier entered active service, with the exception of congenital and hereditary conditions, was not due to the solider's intentional misconduct or intentional or willful neglect and was incurred in line of duty (LD).

***

(4) Acute infections and sudden developments occurring while the soldier is in military service will be regarded as service-incurred or service-aggravated....[4]

Defendant contends these two presumptions are irrelevant because they would not change the Board's finding that Mr. Wagner was non-eligible for medical disability retirement. Defendant bases this argument on the conclusion that Mr. Wagner was not "diagnosed" with PTSD until after retirement. Defendant describes Mr. Wagner's on-duty condition as, at most, "grief therapy/crisis," presumably due to the financial setback during the ADSW tour. Again, Defendant relies upon Mr. Wagner's continuing to work past his ADSW tour release date as proving Mr. Wagner was fit for duty at the time of his termination. (Defendant's Reply and Opp. at 11).

Significantly, in this analysis, Defendant does not discuss the Board's failure to address the most important paragraph in Army Reg. 635-40. This paragraph states:

(5) The foregoing presumptions may be overcome only by a preponderance of the evidence, which differs from personal opinion, speculation, or conjecture. When reasonable doubt exists about a soldier's condition, an attempt should be made to resolve the doubt by further clinical investigation and observation and by consideration of any other evidence that may apply. In the absence

---

[4] Defendant cites the rest of regulation, which provides examples of "acute infections" and "sudden developments." There is no need to cite this part of the regulation.

of such proof by the preponderance of the evidence, reasonable
doubt should be resolved in favor of the soldier.

The Board therefore disregarded this explicit instruction to resolve reasonable doubts about a solider's medical condition in the soldier's favor. The Board also rejected the clinical investigation, undertaken with a month after the Army retired Mr. Wagner, that showed he suffered from PTSD. The Board also rejected the evidence that Mr. Wagner had five medical appointments in one month for the same ongoing condition. These appointments occurred during Mr. Wagner's ADSW tour. The Board should have considered Mr. Wagner's condition in light of Army Reg. 635-40, ¶ 3-2 (5), and resolved any reasonable doubt about whether Mr. Wagner had PTSD while on active duty in Mr. Wagner's favor. Not to do so was arbitrary, capricious and contrary to law and regulation.

### C. Mr. Wagner's Claim that His PTSD Condition Began During His ADSW Tour Is Not Speculative.

Defendant claims there is no medical evidence to support Mr. Wagner's claim that he suffered from PTSD during his active duty ADSW tour. Defendant relies upon the Army physician's "merely" referring Mr. Wagner to the DVA for evaluation and continuing grief/counseling therapy. (Defendant's Reply and Opp. at 12).

Essentially, Defendant sets up a cut-off between Mr. Wagner's medical condition while he was on active service and that after retirement. This limitation, however, defies medical logic. The condition continues without any relation to a date on which the Army retires an individual.

Moreover, the Army physician did not stop his follow-up of Mr. Wagner simply because the Army ended the latter's tour on 29 September 1994. The "Consultation Sheet" from the WRAMC OPC (Walter Reed Army Medical Center Outpatient Clinic) was dated 19 October

-14-

1994, approximately two weeks after the retirement date. Moreover, nothing in the "Consultation Sheet" precludes finding that Mr. Wagner suffered from PTSD at the time. (AR at 639).

Both the 19 October 1994 consultation referral sheet and the 21 October 1994 Consultation Report support the requisite number of months for a PTSD diagnosis. The Consultation Sheet notes hat Mr. Wagner had a "2 mo [history]" of mental problems of frustration, despair and anxiety about his financial concerns and his homelessness. The consultation report states that Mr. Wagner's symptoms were ongoing for the last 3 to 4 weeks. Id. This latter report specifically stated that Mr. Wagner suffered from PTSD and referred him to another physician for psychotherapy. Id.

Given this evidence, the Advisory Opinion concluded that:

> Sergeant Major Wagner's first apparent onset of Post Traumatic
> Stress Disorder (PTSD) was at his medical appointment at
> WRAMC on 19 Sep 94, almost two months after starting his
> ADSW tour.

(AR at 89, Section 5, ¶ c). This conclusion was the reasonable one, contrasted to the Board's unreasonable finding that the PTSD diagnosis was inapplicable because, as the Board asserted, the diagnosis occurred after the retirement date. The Board's "before and after" retirement date standard is arbitrary and capricious and contrary to law or regulation.

Defendant justifies the Board's determination by again citing to the authority it mentioned in its initial memorandum. Mr. Wagner distinguished these cases in his initial memorandum and stands by the discussion there.

Defendant argues that the Board rightly concluded that 10 U.S.C. § 1201 (2008), did not apply to Mr. Wagner because the PTSD did not occur during his ADSW tour. This statute

requires that the member incur the disability while entitled to basic pay, § 1201 (a) & (c); the member be unable to perform the duties of his or her office, grade, rank, or rating because of the disability; Id.; the disability be permanent, Id. at (b)(1).

As Mr. Wagner discussed in his initial memorandum, he meet these requirements. He incurred his disability, PTSD, during the course of active duty, the ADSW tour, when he was entitled to basic pay. Because of the PTSD, he could not perform his duties or perform them adequately. His PTSD is permanent. (Wagner Mem. at 8-9). The Board's decision that this statute does not apply to Mr. Wagner is arbitrary, capricious or contrary to law or regulation.

### D. The Board's Finding that the "Phase of Life" Diagnosis Was Not Supported by Substantial Evidence Was Arbitrary and Capricious.[5]

### 1. The Board's Finding that "Phase of Life Problem" Applied to Mr. Wagner Did Not Have a Rational Connection to the Facts Found and the Choice Made.

Defendant claims that substantial evidence supports the Board's finding that the "Phase of Life" Diagnosis was correct. To support this argument, Defendant cites Roberts v. Geren, 530 F. Supp.2d 24 (D.D.C. 2004). Roberts articulated the standard for a court's review of a Board decision:

> A court "will not disturb the decision of an agency that has 'examine[d] the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" MD Pharm. v. Drug Enforcement Admin., 133 F.3d 8, 16 (D.C. Cir. 1998). "[I]f the record contains such evidence that a reasonable mind might accept as adequate to support a conclusion, the court must accept the

---

[5] This argument also addresses the Defendant's "Phase of Life Problem" discussion on page 15 of Defendant's Reply and Opposition Memorandum.

Board's findings." <u>Smith v. Dalton</u>, 927 F. Supp. 1, 5 (D.D.C. 1996).

(Citations omitted). There is no "rational connection between the facts found and the choices made" by the Board in Mr. Wagner's case. Therefore, the Court need not accept the Board's finding on this issue.

As Mr. Wagner explained in his initial memorandum, there is no substantial evidence to support the Board's conclusion that "Phase of Life Problem" was the correct diagnosis for what was and is PTSD. (Wagner Mem. at 19-21). The DSM-IV, V62.89, describes this condition as:

> This category can be used when the focus of clinical attention is a problem associated with a particular developmental phase or some other life circumstance that is not due to a mental disorder or, if it is due to a mental disorder, is sufficiently severe to warrant independent clinical attention. Examples include problems associated with entering school, leaving parental control, starting a new career and changes involved in marriage, divorce, and retirement.

As Defendant noted, the Board relied on this definition in its 2005 decision. (Defendant's Reply and Opp. at 17).

The unreasonableness of the Board's determination is apparent from the reasoning about why Mr. Wagner's problem was not due to a "mental disorder." The Board explained that Mr. Wagner "acknowledge[d] it was due to a financial problem with the IRS and then to DFAS's response to the IRS levy (and failure to respond to the release from levy) when he began his ADSW tour (analogous to a new career)." <u>Id</u>.

The flaws in this analysis are glaring. First, the financial problem was not itself the condition, but the trigger to Mr. Wagner's mental disorder of PTSD. Second, there is no evidence whatsoever that beginning the ADSW tour created any mental or other problems for

Mr. Wagner. This was not a new career for Mr. Wagner, who spent his entire adult life up to

then in some capacity in the Army. It was not as though Mr. Wagner had just joined the Army

and had to transition from civilian to military life. Third, as Mr. Wagner has explained in his

first memorandum, the financial problem did not occur at the beginning of his ADSW tour, but

in August, in the middle of the tour. (Wagner Mem. at 21).

Defendant points to the Board's reliance on the findings of the Office of the Surgeon and

the Judge Advocate at the NGB concluding that there was no support for PTSD and the Board's

stating that all the evidence point to "elevated anxiety" because of the money problem "about the

time [Mr. Wagner] was ordered to active duty." Id. at 18. Defendant also comments that the

determination of the WRAMC Chief of Outpatient Psychiatry Services that Mr. Wagner's

medical information showed that he did not suffer from PTSD was correct. Id.

However, Defendant does not address the finding of the formal LOD in April 2005. As

the Board acknowledged in its 2005 decision:

> 17. A formal LOD was conducted in April 2005. The
> investigating officer noted in item 10a(4) (How sustained) of the
> DD Form 261 (Report of Investigation Line of Duty and
> Misconduct Status), "Mental Stress, Financial, Death of Spouse,"
> noted in item 10b (Medical Diagnosis), "Mental Post traumatic,"
> and noted in item 10g (Remarks) that the applicant need to seek
> continuous medical care for his illness. The investigating officer
> found the illness to have been incurred in the line of duty.

(AR at 70).

The Board's disregard of this finding establishes that the Board did not "examine the

relevant data and articulate a satisfactory explanation for its action." The Board did not articulate

a rational connection between the facts found and the choice made, that Mr. Wagner suffered

from only a "Phase of Life Problem." Therefore, this Court is free to overturn the Board's

decision on this diagnosis.

### 2. The Medical Evidence Contradicted the "Phase of Life Problem" Diagnosis.

Mr. Wagner discussed in detail the conflicting medical evidence that refuted the Phase of

Life Problem" diagnosis and references the Court to that section. (Wagner Mem. at 19-21).

Concerning Defendant's arguments in his reply and opposition to summary judgment, (pp. 18-

19). Mr. Wagner responds that:

First, contrary to Defendant's position, the Walter Reed physician's note of Mr.

Wagner's symptoms of "2 mo. frustration, despair and anxiety because of financial and housing

crisis" on the consultation sheet suggest much more than a problem arising from a life change. In

fact, the trigger was not a life change. The financial and housing crisis, as Mr. Wagner has

explained, arose from the Army's sending off Mr. Wagner's pay to the IRS after the levy was

lifted and then telling Mr. Wagner to take care of the problem himself. As a result, Mr. Wagner

did not have sufficient funds for necessities and housing. To conclude that Mr. Wagner was

dealing with a life change simply ignores the evidence.

Second, Defendant attempts to argue that the offering of hospitalization to Mr. Wagner

on 3 September 1994 while he was serving on the ADSW tour does not establish that Mr.

Wagner was suffering from PTSD. Defendant states, in justification of this argument that, "it is

common knowledge people are often hospitalized for depression which does not equate to

PTSD." (Defendant's Reply and Opp. at 19). Common knowledge, however, does not displace

the medical evidence which Mr. Wagner discussed in his initial Memorandum.

Defendant is wrong in maintaining that Mr. Wagner did not present sufficient medical evidence to controvert the "Phase of Life Problem" diagnosis.

Lastly, as Army Reg. 635-40(5) requires, "In the absence of such proof by the preponderance of the evidence, reasonable doubt should be resolved in favor of the soldier."[6]

### E. The 2005 Board's Refusal to Change the LOD Determinations Was Arbitrary, Capricious and Contrary to Law or Regulation.

Defendant claims that Mr. Wagner failed to meet his burden to show that the Board's denial of changing the LOD Determinations was arbitrary, capricious and Contrary to Law or Regulation. (Defendant's Reply and Opp. at 19-20). Mr. Wagner fully discussed this issue in his initial memorandum and relies on the arguments there. (Wagner Mem. at 21-24). However, Mr. Wagner will address the arguments which Defendant makes in this section.

First, Defendant claims that Mr. Wagner acknowledged that the Board reviewed all the evidence and implies that this amounts to a concession. Defendant, however, reads the actual sentence out of context. In his initial memorandum, Mr. Wagner concluded this argument about the LOD determinations saying:

> The fact that the Board reviewed all the evidence does not justify its refusal to correct the not in the line of duty findings. The Court should find that this ruling was arbitrary and capricious and not supported by substantial evidence.

Id. at 24. Therefore, there is no concession in Mr. Wagner's comment on the Board's review of evidence.

---

[6] This is not an admission that a preponderance of medical evidence does not exist in Mr. Wagner's case.

Second, Defendant again relies upon the Board's conclusion that there is no evidence that Mr. Wagner suffered from PTSD at the beginning of September 1994 or during the rest of his ADSW tour. (Defendant's Reply and Opp. at 20). The evidence that Mr. Wagner has presented in this and his initial memorandum proves otherwise. Defendant is also arbitrary in dividing Mr. Wagner's condition into before and after the retirement date of 29 September 1994.

Third, Defendant again relies upon the fitness for duty and the "Phase of Life Problem" diagnosis conclusions to determine that the Board correctly denied change in the LOD recommendation. Id. Mr. Wagner has already discussed the unreasonableness of these determinations. The relationship of the LOD finding to referral to the Physical Disability System is irrelevant in Mr. Wagner's seeking correction of the LOD. As the Board stated in its 2005 decision:

> ... this is not meant to prevent the applicant from appealing the findings of the LOD based upon it being conducted by a command not authorized to do so.

(AR at 77, ¶ 11). Defendant refers to this conclusion. (Defendant's Reply and Opp. at 20-21).

Fourth, Defendant again relies upon the Board's position that Mr. Wagner's problems and emotional concerns really began prior to the start of his ADSW tour, 1 July 1994, when the IRS first placed a levy on his wages. Id. at 21. However, Mr. Wagner continues to dispute this finding. As he has previously argued, in this and his initial memoranda, his mental problems did not arise until the Army withheld and sent to the IRS almost all his salary at the end of August 1994 and told Mr. Wagner that he had to deal with the IRS himself on this matter. The Board and the Defendant's continued reliance on July 1994 as the starting date for Mr. Wagner's financial problems and the resulting PTSD is simply unreasonable.

-21-

Defendant cites the 22 July 2005 NGB legal review of the 1995 LOD investigation which noted that at 19 Sept 94 Mr. Wagner "informed doctors that he had been confronting financial and mental problems since 1 Jul 94." Id., *citing* AR at 105, ¶ 4. This statement, however, is incorrect. The 19 October 1994 Consultation Sheet notes that on that date, Mr. Wagner had "2 mo. hx [history] of frustration, despair & anxiety re: financial concerns/housing." Counting two months back from 19 October 1994 goes to 19 August 1994, not 1 July 1994. Therefore, Defendant cannot rely on the NGB legal review or its conclusion which Defendant cites to. (Defendant's Reply and Opp. at 21-22). The fact is, Mr. Wagner has never referred to 1 July 1994 or any date prior to the ADSW tour as the beginning of his financial troubles and PTSD.

The above arguments in no way support the validity of the Board decision on the LOD. As Mr. Wagner argued in his previous Memorandum, the Board's denial was arbitrary, capricious or contrary to law or regulation.

### F. Remand to the Board Is Necessary.

Defendant cites a plethora of decisions to justify not remanding this case to the Board. This precedent does not preclude remand. First, Mr. Wagner's two memoranda exhaustively establish that the Board did not follow Roberts, 530 F. Supp.2d at 34, and articulate a rational connection between the facts found and the choices it made. The evidence for the Board's decision simply does not constitute such that a reasonable mind might accept as adequate to support the Board's decision. Moreover, the outcome is not clear in Mr. Wagner's case.

Mr. Wagner has explained why the Best Evidence rule negates the use of the blank DA Form 1058-R to prove the contents of the lost form — Mr. Wagner's signature agreeing to waiver of sanctuary. The presumption of administrative regularity cannot trump the evidence

rule. A blank sheet cannot trump a lost sheet with the signature. Collateral evidence such as denial of an exception to the 180-day limit on ADSW tours or the 60-day break rule or Mr. Wagner's consent to a tour of limited duration cannot prove the existence of a signature.

Also, the Board disregarded the medical evidence establishing that Mr. Wagner suffered from PTSD while on active duty and that the "Phase of Life Problem" diagnosis was irrational.

Given the Board's arbitrary and capricious rulings or ones contrary to law or regulation, the Court should determine the Board's ruling was arbitrary and capricious and remand the case to the Board for proper consideration.

### CONCLUSION.

In light of the above, the Court should grant Mr. Wagner's motion for summary judgment on all his claims.

Respectfully submitted,

August 18, 2008

*/s/ Lynn I. Miller*
Lynn I. Miller, #941559
James R. Klimaski, #243543
Klimaski & Associates, P.C.
1625 Massachusetts Avenue NW – Suite 500
Washington, DC 20036-2245
202-296-5600
Miller@Klimaskilaw.com
Klimaski@Klimaskilaw.com

*Attorneys for George W. Wagner, Jr.*

**Certificate of Service**

I certify that the foregoing ***Plaintiff's Reply to Defendant's Opposition to Plaintiff's Cross Motion for Summary Judgment*** will be served to the following counsel for Defendant in this case by the Court's CM/ECF system after proper filing of an Adobe PDF version of these items on the Court's secure website on August 18, 2008:

> Lanny Acosta
> Special Assistant U.S. Attorney
> Civil Division
> 555 Fourth Street NW
> Washington, DC  20530
> Fax:  202-514-8780

*/s/ Jon Pinkus*
Jon Pinkus
Klimaski and Associates, PC